

United States Courts
Southern District of Texas
FILED

NOV 13 2001

Michael N. Milby, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| JOHN & PEGGY ODAM, | § | CIVIL ACTION NO. H-01 -3914 |
| FRED A. ROSEN and MARIAN ROSEN, | § | |
| HAL MOORMAN AND MILTON TATE, | § | |
| TRUSTEES FOR MOORMAN, TATE, | § | |
| MOORMAN & URQUART MONEY | § | |
| PURCHASE PLAN & TRUST, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | COMPLAINT FOR VIOLATIONS |
| | § | OF FEDERAL SECURITIES LAWS |
| ENRON CORPORATION, ANDREW S. | § | |
| FASTOW, KENNETH L. LAY, | § | |
| JEFFREY J. SKILLING, RONNIE C. CHAN, | § | |
| JOHN H. DUNCAN, WENDY L. GRAMM, | § | |
| ROBERT K. JAEDICKE, CHARLES A. | § | |
| LEMAISTRE, JOHN MENDELSOHN, | § | |
| PAUL V. FERRAZ PEREIRA, | § | |
| FRANK SAVAGE, JOHN WAKEHAM, | § | |
| HERBERT S. WINOKUR, JR., BEN GLISAN, | § | |
| KRISTINA MORDAUNT, and | § | |
| ARTHUR ANDERSEN, L.L.P., | § | |
| Defendants. | § | JURY TRIAL DEMANDED |

## PLAINTIFFS' ORIGINAL COMPLAINT

COMES NOW Plaintiffs John & Peggy Odam, Fred A. Rosen and Marian Rosen, and

Hal Moorman and Milton Tate, Trustees, by their undersigned attorneys, alleges upon personal

knowledge as to themselves and their own acts, and upon information and belief as to all other

matters, based upon, *inter alia*, the investigation made by and through their attorneys, which

investigation included, *inter alia*, a review and analysis of the public documents and press

releases of Enron Corp. ("Enron").

## NATURE OF THE ACTION

1.     This is a securities fraud action brought against Enron Corporation ("Enron"), and certain of its officers and directors as well as its auditors.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction of this action pursuant to Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78aa], and 28 U.S.C. §§ 1331 and 1337.

3.     This action arises under and pursuant to Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)], Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5] and Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) and (c).  Enron has its headquarters in this District, and the acts complained of herein, including the preparation, issuance and dissemination of materially false and misleading information to the investing public, occurred in substantial part in this District.

5.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications and the facilities of the New York Stock Exchange, a national securities exchange.

## PARTIES

6.     Plaintiffs John and Peggy Odam are citizens of the State of Texas who owned 850 shares of Enron common stock, but sold 503 shares on November 9, 2001 at $7.50 per share. Plaintiffs Fred A. Rosen and Marian Rosen are citizens of the State of Texas who own 1950 shares of Enron common stock.  Plaintiffs Hal Moorman and Milton Tate are trustees for

Moorman, Tate, Moorman & Urquart Money Purchase Plan & Trust and are citizens of the State of Texas who own 200 shares of Enron common stock.

7.      Defendant Enron is an Oregon corporation with its principal executive offices located at 1400 Smith Street, Houston, Texas.  According to its public filings, Enron is the largest buyer and seller of natural gas, and the top wholesale power marketer in the United States.  Enron operates a 25,000-mile gas pipeline system in the United States.  The Company also markets and trades in commodities such as electricity, weather futures, metals, paper, coal, chemicals, and fiber-optic bandwidth.

8.      Defendant Chan has been an Enron director since 1996.  Chan has been Chairman of Hang Lung Group, comprising three publicly traded Hong Kong-based companies involved in property development, property investment and hotels.  Mr. Chan also co-founded and is a director of various companies within Morningside/Springfield Group, which invests in and manages private companies in the manufacturing and service businesses, and engages in financial investments.  Mr. Chan is also a director of Standard Chartered PLC and Motorola, Inc.  Defendant Chan may be served with process by mailing, by certified mail, return receipt requested, a copy of the citation and a copy of the petition attached thereto, to Defendant Enron's registered agent in the State of Texas, National Registered Agents, 905 Congress Avenue, Austin, Texas 78701.

9.      Defendant Duncan has been an Enron director since 1985.  Duncan's principal occupation has been investments since 1990.  Mr. Duncan is also a director of EOTT Energy Corp. (the general partner of EOTT Energy Partners, L.P.) and Group I Automotive Inc.  Defendant Duncan may be served with process by mailing, by certified mail, return receipt requested, a copy of the citation and a copy of the petition attached thereto, to Defendant Enron's

registered agent in the State of Texas, National Registered Agents, 905 Congress Avenue, Austin, Texas 78701.

10.     Defendant Andrew S. Fastow ("Fastow") is Enron's former Executive Vice President and Chief Financial Officer.  Defendant Fastow may be served with process by mailing, by certified mail, return receipt requested, a copy of the citation and a copy of the petition attached thereto, to Defendant at 1831 Wroxton, Houston, Texas 77005.

11.     Defendant Gramm has been an Enron director since 1993.  Gramm is an economist and Director of the Regulatory Studies Program of the Mercatus Center of George Mason University.  From February 1988 until January 1993, Dr. Gramm served as Chairman of the Commodity Futures Trading Commission in Washington, D.C., Dr. Gramm is also a director of IBP, Inc., State Farm Insurance Co. and Invesco Funds.  Dr. Gramm was also a director of the Chicago Mercantile Exchange until December 31, 1999.  Defendant Gramm may be served with process by mailing, by certified mail, return receipt requested, a copy of the citation and a copy of the petition attached thereto, Defendant Enron's registered agent in the State of Texas, National Registered Agents, 905 Congress Avenue, Austin, Texas 78701.

12.     Defendant Jaedicke has been an Enron director since 1985.  Jaedicke is Professon (Emeritus) of Accounting at the Stanford University Graduate School of Business in Stanford, California.  He has been on the Stanford University faculty since 1961 and served as Dean from 1983 until 1990.  Dr. Jaedicke is a director of California Water Service Company and Boise Cascade Corporation and he plans to retire from the Boise Cascade Corporation board in April 2001.  Dr. Jaedicke was also a director of GenCorp, Inc. until July 2000.  Defendant Jaedicke may be served with process by mailing, by certified mail, return receipt requested, a copy of the

F:\Fleming Law Docs\Enr12276 Complaint#2 gsj 11-12-01.doc       4

citation and a copy of the petition attached thereto, to Defendant Enron's registered agent in the State of Texas, National Registered Agents, 905 Congress Avenue, Austin, Texas 78701.

13.    Defendant Lay has been an Enron director since 1985.  Lay has been Chairman of the Board of Enron since 1986.  From 1986 until February 2001, Mr. Lay was also the Chief Executive Officer of Enron.  On August 14, 2001, Lay became President and CEO of Enron upon the surprise resignation of defendant Skilling, as further described below.  Mr. Lay is also a director of Eli Lilly and Company, Compaq Computer Corporation, EOTT Energy Corp. (the general partner of EOTT Energy Partners, L.P.), i2 Technologies, Inc. and NewPower Holdings, Inc.  Defendant Lay may be served with process by mailing, by certified mail, return receipt requested, a copy of the citation and a copy of the petition attached thereto, to his principal place of business, 1400 Smith Street, Houston, Texas 77002.

14.    Defendant LeMaistre has been an Enron director since 1985.  LeMaistre served as President of the University of Texas M.D. Anderson Cancer Center in Houston, Texas and now holds the position of President Emeritus.  Defendant LeMaistre may be served with process by mailing, by certified mail, return receipt requested, a copy of the citation and a copy of the petition attached thereto, to Defendant Enron's registered agent in the State of Texas, National Registered Agents, 905 Congress Avenue, Austin, Texas 78701.

15.    Defendant Mendelsohn has been an Enron director since 1999.  Mendelsohn has served as President of the University of Texas M.D. Anderson Cancer Center.  Prior to 1996, Dr. Mendelsohn was Chairman of the Department of Medicine at Memorial Sloan-Kettering Cancer in New York, Dr. Mendelsohn is also a director of ImClone Systems, Inc.  Defendant Mendelsohn may be served with process by mailing, by certified mail, return receipt requested, a copy of the citation and a copy of the petition attached thereto, to Defendant Enron's registered

agent in the State of Texas, National Registered Agents, 905 Congress Avenue, Austin, Texas 78701.

16.     Defendant Pereira has been an Enron director since 1999. Pereira is Executive Vice President of Group Bozano. Mr. Pereira served for over five years as President and Chief Operating Officer of Meridional Financial Group and Managing Director of Group Bozano. Mr. Pereira is also the former President and Chief Executive Officer of the State Bank of Rio de Janeiro. Defendant Pereira may be served with process by mailing, by certified mail, return receipt requested, a copy of the citation and a copy of the petition attached thereto, to Defendant Enron's registered agent in the State of Texas, National Registered Agents, 905 Congress Avenue, Austin, Texas 78701.

17.     Defendant Savage has been an Enron director since 1999. Savage has served as Chairman of Alliance Capital Management International (a division of Alliance Capital Management, L.P.). Mr. Savage is also a director of Lockheed Martin Corporation, Alliance Capital Management L.P. and Qualcomm Corp. Defendant Savage may be served with process by mailing, by certified mail, return receipt requested, a copy of the citation and a copy of the petition attached thereto, to Defendant Enron's registered agent in the State of Texas, National Registered Agents, 905 Congress Avenue, Austin, Texas 78701.

18.     Defendant Skilling has been an Enron director since 197. Mr. Skilling served as President and Chief Executive Officer of Enron from February 2001 through August 14, 2001, when he announced his unexpected resignation from the offices of both President and CEO. It was also announced on that date that Skilling would remain on the Board of Directors, and that he would serve as a consultant to the Company through the year 2005. Mr. Skilling served as President and Chief Operating Officer of Enron from January 1997 through February 2001.

From August 1990 until December 1996, he served as Chairman and Chief Executive Officer of Enron North America Corp. and its predecessor companies. Mr. Skilling is also a director of the Houston Branch of the Federal Reserve Bank of Dallas. Defendant Skilling may be served with process by mailing, by certified mail, return receipt requested, a copy of the citation and a copy of the petition attached thereto, to Defendant Enron's registered agent in the State of Texas, National Registered Agents, 905 Congress Avenue, Austin, Texas 78701.

19. Defendant Wakeham has been an Enron director since 1994. Wakeham is a retired former U.K. Secretary of State for Energy and Leader of the Houses of Commons and Lords. He served as a Member of Parliament from 1974 until his retirement from the House of Commons in April 1992. Prior to his government service, Lord Wakeham managed a large private practice as a chartered accountant. He is currently Chairman of the Press Complaints Commission in the U.K. and chairman of director of a number of publicly traded U.K. companies. Defendant Wakeham may be served with process by mailing, by certified mail, return receipt requested, a copy of the citation and a copy of the petition attached thereto, to Defendant Enron's registered agent in the State of Texas, National Registered Agents, 905 Congress Avenue, Austin, Texas 78701.

20. Defendant Winokur has been an Enron director since 1985. Winokur is Chairman and Chief Executive Officer of Capricorn Holdings, Inc. (a private investment company) and Managing General Partner of Capricorn Investors, L.P., Capricorn Investors II, L.P. and Capricorn Investors III, L.P., partnerships concentrating on investments in restructure situations, organized by Mr. Winokur in 1987, 1994 and 1999, respectively. From August 2000 until March 2001, Mr. Winokur served as Non-executive Chairman of Azurix Corp. Prior to his current appointment, Mr. Winokur was Senior Executive Vice President and a director of Penn



Central Corporation. He is also a director of NATCO Group, Inc., Mrs. Fields' Holding Company, Inc., CCC Information Services Group, Inc. and DynCorp. Defendant Winokur may be served with process by mailing, by certified mail, return receipt requested, a copy of the citation and a copy of the petition attached thereto, to Defendant Enron's registered agent in the State of Texas, National Registered Agents, 905 Congress Avenue, Austin, Texas 78701.

21. Defendant Glisan was a managing director and treasurer of Enron until November of 2001. Defendant Glisan may be served with process by mailing, by certified mail, return receipt requested, a copy of the citation and a copy of the petition attached thereto, to 15322 Baybrook Drive, Houston, Texas 77062. This Defendant was discharged for self-dealing the week of November 5, 2001.

22. Defendant Mordaunt was a managing director and general of an Enron division until November of 2001. Defendant Mordaunt may be served with process by mailing, by certified mail, return receipt requested, a copy of the citation and a copy of the petition attached thereto, to her home address of 4531 West Alabama, Houston, Texas 77027-4803. This Defendant was discharged for self-dealing the week of November 5, 2001.

23. Defendant Arthur Andersen, L.L.P. is a partnership, whose business address is 901 Main Street, Suite 5600, Dallas, Texas 75202. Defendant Arthur Andersen, L.L.P. may be served with process by mailing its registered agent, by certified mail, return receipt requested, a copy of the citation and a copy of the petition attached thereto, to P. Scott Ozanus, 901 Main Street, Suite 5600, Dallas, Texas 75202. Arthur Anderson was the independent auditor for Enron during the relevant portions complained of herein and prepared the audits and financial statements relied upon by investors such as Plaintiffs.

24.    Collectively, the defendants identified in paragraphs 8-22 are referred to as the "Individual Defendants." The Individual Defendants, through their positions as directors and/or senior officers of Enron, had responsibility for the management of Enron's business and operations.

25.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in Enron's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers of Enron, by virtue of their high-level positions with Enron, directly participated in the management of Enron, was directly involved in the day-to-day operations of Enron at the highest levels and was privy to confidential proprietary information concerning Enron and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding Enron, and approved or ratified these statements, in violation of the federal securities laws.

26.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to Enron's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially

misleading or untrue, so that the market price of Enron's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions violated these specific requirements and obligations.

27. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Enron, each of the Individual Defendants had access to the adverse undisclosed information about Enron's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Enron and its business issued or adopted by Enron materially false and misleading.

28. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Enron, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to Enron. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations contained therein.

29. Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on Plaintiffs by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the

Plaintiffs and the investing public regarding Enron's business, its finances and the intrinsic value of Enron's common stock; and (ii) caused Plaintiffs to purchase Enron's common stock at artificially inflated prices.

### Just the Facts

30.    In 1999, Defendant Fastow formed two investment partnerships, LJM Cayman LP ("LJM") and LJM2 Co-Investment LP ("LJM2"). LJM and LJM2 are private investment companies that, according to Enron's public filings, engage in acquiring or investing in primarily energy-related investments. Fastow was the managing member of the general partner of each of the two partnerships.

31.    Mr. Fastow's role as chief financial officer made him privy to internal asset analyses at Enron. An offering memorandum for the LJM2 Co-Investment, L.P. ("LJM2") partnership said that this dual role "should result in a steady flow of opportunities. . . to make investments at attractive prices."

32.    Incredibly, the document reportedly goes so far as to expressly acknowledge the glaring conflict of interest that existed under this agreement and the multi-million dollar incentive for Fastow to engage in self-dealing to the detriment, and at the expense of, Enron and its stockholders to whom he and the Director Defendants owned a fiduciary duty and states that this dual role "should result in a steady flow of opportunities. . . to make investments at attractive prices and that *Mr. Fastow would find his interests "aligned" with investors because the "economics of the partnership would have significant impact on the general partner's [Mr. Fastow] wealth."* (Emphasis added).

33.    Defendants clearly breached their fiduciary duties by expressly approving the agreement with Mr. Fastow which created a situation of irreconcilable conflict and placed



Enron's CFO in the middle of that conflict by putting Fastow, who is responsible for overseeing the financial interests of the company, in charge of partnerships that were routinely purchased assets from Enron.

34.    Remarkably, defendant Lay reportedly denied the existence of any conflict of interest arising out of the LJM arrangement. Such related-party transactions, involving top managers or directors, aren't unusual, he said. "Almost all big companies have related-party transactions."

35.    Enron has publicly stated that the partnership deals were aimed to help it hedge against fluctuating values for its growing portfolio of assets. In the past decade, Enron has seen its asset base rocket to more than $100 billion. As a result of this rapid growth, Enron has at times been strapped for capital and has sought ways to bring in outside investors to help bolster its balance sheet.

36.    Despite statements designed to make the partnership deals seem innocuous, the positions Fastow held with the partnerships (and Enron) allowed Fastow to benefit from the illicit use of confidential, non-public information. An egregious example of this occurred in connection with a $30 million LJM2 investment in a project known as "Raptor III" in September 2000. This transaction involved writing put options committing LJM2 to buy Enron stock at a set price for six months. Writers of put options benefit from higher prices of the underlying stock, and are hurt by declining prices. As reported in the *Wall Street Journal* on October 19, 2001: "Only four months into this six month deal, LJM2 approached Enron to settle the investment early, causing LJM2 to receive its $30 million capital invested, plus $10.5 million in profit." The information quoted came from an internal report produced by defendant Fastow for the partnership investors, but withheld from the public. The article further reported that: "The

renegotiation was before a decline in Enron's stock price, which could have forced LJM2 to buy Enron shares at a loss of as much as $8 each." Thus, Fastow and LJM2 took advantage of inside information to recap illicit insider trading profits, in the millions of dollars in this transaction alone.

37.    Finally, the fallout from the revelations about the partnership wrongdoing has had negative financial repercussions for Enron. These include a steep decline in its stock price, loss of investor and Wall Street confidence, and increased costs of attracting and retaining employees. The Company's cover up of the Fastow agreement and other related transactions have subjected Enron to strong criticism from investors and analysts alike.

38.    On October 23, 2001, the Associated Press reported that various partnership transactions purportedly resulted in a gain of $16 million (pretax) in 1999, and a loss of $36 million in 2000. The same article quoted a top analyst as sharply criticizing Enron's concealment of the partnership deals. "What you are hearing from many is that the company's credibility is being questioned and there is a need for disclosure," said David Fleischer of Goldman, Sachs & Co. "That is exactly what I think needs to happen. There is an appearance that you are hiding something. . . I for one find the disclosure is not complete enough for me to understand." To add fuel to the fire, the Company also acknowledged that the SEC had begun an investigation into Enron's accounting practices with regard to the partnerships.

39.    On the basis of the foregoing, the Director Defendants breached the fiduciary duties that each of them owed to Enron and its public stockholders by expressly approving of a number of agreements that placed Enron's Chief Financial Officer in a position where he was permitted to capitalize on his knowledge of Enron's proprietary financial information for the benefit of numerous partnerships of which he served as a general partner.

40.    Significantly, officers and directors of Enron had financial interests in all or some of these partnerships.  As such, by approving the agreements that enabled Mr. Fastow to act in dual capacities, defendants effectively engaged in self-dealing and placed Mr. Fastow in a position where he was capable of misappropriating Enron's confidential financial information for the purpose of enriching the partnerships he served as a general partner of, as well as furthering the financial interests of other investors in the partnerships—all to the detriment of Enron.  In so doing, the Direct Defendants breached their fiduciary duties of loyalty that each of them owed to Enron and its public stockholders and caused Enron to incur losses in the amount of at least $35 million.

41.    According to published reports, the general partner of the two investment partnerships was paid management fees as much as 2% annually of the total amounts invested in the partnerships.  Additionally, the general partner was eligible for profit participation that could produce tens of millions of dollars more if the partnership met its performance goals over its projected 10-year life.  Inasmuch as the partnerships were formed with the intention of managing over $200 million in assets, Defendant Fastow's potential profits from managing the partnership exceeded $4 million a year.

42.    Since their formation, LJM and LJM2 have engaged in billions of dollars of complex hedging transactions with Enron – in which Enron had adverse interests.  By their very nature, Enron's transactions with these two investment partnerships, if successful, would result in losses to Enron.

43.    Because Defendant Fastow was on both sides of the transactions between Enron and the investment partnerships, the terms of those transactions were not at arm's-length and

there was no reasonable method to ensure that the terms of those transactions were equivalent to transactions that could have been engaged in with third parties.

44.     For example, Enron entered into a series of complex transactions in 1999 involving LJM and a third-party, pursuant to which (i) Enron and the third-party amended certain forward contracts to purchase shares of Enron common stock, resulting in Enron having forward contracts to purchase Enron common shares at the market price on the day of the agreement, (ii) LJM received about 6.8 million shares of Enron common stock, and (iii) Enron received a note receivable and certain financial instruments from LJM hedging an investment held by Enron.

45.     During the fourth quarter of 1999, LJM2 acquired approximately $360 million of merchant assets and investments from Enron.  Further, in December, 1999, LJM2 entered into agreements to acquire certain of Enron's interest and assets for about $45 million.

46.     In 2000, Enron again entered into transactions with LJM, LJM2, and entities related to LJM and LJM2, to hedge certain merchant investments and other assets.  Enron contributed about $1.2 billion of assets, including notes payable and restricted shares of outstanding Enron common stock and warrants, to LJM-related entities.  Additionally, Enron entered into derivative transactions with a combined amount of about $2.1 billion with LJM-related entities to hedge certain assets.  These transactions put Enron at risk in amounts exceeding $1 billion.

47.     In all, between June 1999 and September 2001, Enron and Enron-affiliated entities did 24 deals with LJM1 or LJM2 or both, ranging from buying and selling hard assets, purchasing debt or equity interests, and selling the rights to buy or sell shares of stock at certain preset prices.

48.    In fact, the LJM2 offering document, which was prepared under the direction of Defendant Fastow, admitted that the responsibilities of Mr. Fastow and other partnership officials to Enron could "from time to time conflict with fiduciary responsibilities owed to the Partnership and its partners."

49.    As reported in TheStreet.com on July 12, 2001, Enron was questioned in a conference call that day about the Company's transactions with LJM and LJM2. Defendant Skilling falsely represent the true state of affairs by representing that LJM and LJM2 had done "a couple of real minor things."

50.    In July 2001, Fastow terminated his interests in the partnerships, and Enron unwound its financial relationships with the partnerships.

### Additional Materially False and Misleading Statements

51.    On January 18, 2000, Enron issued a press release announcing its financial results for the fourth quarter of 1999 and fiscal year 1999. The Company reported that for fiscal 1999 it earned $957 million and had revenues of $40 billion. Defendant Lay commented on the results, stating in pertinent part as follows:

> Our strong results in both the fourth quarter and full year 1999 reflect excellent performance in all of our operating businesses. . . . In addition, Enron continues to develop innovative, high-growth new businesses that capitalized on our core skills, as demonstrated by the early success of our new broadband services businesses. Overall, a great year – one in which our shareholders received a total return of 58 percent.

52.    On January 20, 2000, Enron issued a press release announcing that the Company had hosted its annual analyst conference in Houston that same day. With respect to the Broadband Services Division, the press release stated in pertinent part as follows:

> The new name of Enron's communications business, Enron Broadband Services, reflects its role in the very fast growing market for premium broadband services. Enron is deploying an open flexible global broadband network controlled by

software intelligence, which precludes the need to invest in a traditional point-to-point fiber network.

53.    On April 12, 2000, Enron issued a press release announcing its financial results for the first quarter of 2000, the period ending March 31, 2000.  The Company reported net income of $338 million, or $0.40 per share, and revenues of $13.1 billion.  Defendant Lay highlighted the Company's Broadband business, stating in pertinent part as follows:

> In our newest business, we significantly advanced deployment of our broadband network and saw strong response to our bandwidth intermediation and content delivery products.

The press release further described the developments in the Broadband business as follows:

> Enron is replicating its unique business model and skills to deploy a global network for the delivery of comprehensive bandwidth solutions and high bandwidth applications.

> During the first quarter, Enron significantly advanced its network development. New agreements have been signed with over 20 broadband distribution partners.

54.    On July 24, 2000, Enron issued a press release announcing its financial results for the second quarter of 2000, the period ending June 30, 2000.  The Company reported net income of $289 million, or $0.34 per share, and revenues of $16.9 billion for the second quarter.  Defendant Lay described the results as "another excellent quarter" and highlighted that Enron Broadband had recently executed "an exclusive, 20-year, first-of-its-kind contract with Blockbuster to stream on-demand movies."  The press release further reported that Enron Broadband had executed $19 million of new contracts.

55.    On October 17, 2000, Enron issued a press release announcing its financial results for the third quarter of 2000, the period ending September 30, 2000. The Company reported net income of $292 million, or $0.34 per share, and revenues of $30 billion.  Defendant Lay commented on the results stating in pertinent part as follows:

Enron delivered very strong earnings growth again this quarter, further demonstrating the leading market positions in each of our major businesses . . . . We operate in some of the largest and fastest growing markets in the world and we are very optimistic about the continued strong outlook for our company.

With respect to Broadband Services, the press release reported, among other things, that "Enron delivered 1,399 DS-3 months equivalents of broadband capacity, which was a 42 percent increase over the previous quarter."

56.     On January 22, 2001, Enron issued a press release announcing its financial results for the fourth quarter of 2000 and fiscal year 2000, the period ending December 31, 2000. The Company reported earnings of $0.41 per share for the fourth quarter of 2000. Defendant Lay commented on the results stating in pertinent part as follows:

Our strong results reflect breakout performances in all of our operations, . . . . Our wholesale services, retail energy and broadband businesses further expanded their leading market positions, as reflected in record levels of physical deliveries, contract originations and profitability. Our shareholders had another excellent year in 2000, as Enron's stock returned 89 percent, significantly in excess of any major investment index.

With respect to Broadband Services, the press release stated:

In addition, Enron Broadband Services reported a $32 million IBIT loss. These results include costs associated with building this new business, partially offset by the monetization of a portion of Enron's broadband delivery platform.

*     Enron Broadband Services delivered 2,393 DS-3 month equivalents of capacity, representing a 71 percent increase over the third quarter of 2000. In addition, transaction levels also significantly increased to 236 transactions in the fourth quarter, compared to 59 transactions in the third quarter of 2000.

57.     On January 30, 2001, Enron issued a press release announcing that it had priced an offering of 20-year zero coupon convertible senior debt securities, raising $1.25 billion.

58.     On April 17, 2001, Enron issued a press release announcing its financial results for the first quarter of 2001, the period ending March 30, 2001. The Company reported earnings

of $0.47 per share.  Defendant Skilling commented on the results, stating in pertinent part as follows:

> Enron's wholesale business continues to generate outstanding results. Transaction and volume growth are translating into increased profitability . . . . In addition, our retail energy services and broadband intermediation activities are rapidly accelerating.

With respect to Broadband Services, the press release stated, among other things, as follows:

> Enron's global broadband platform is substantially complete, and 25 pooling points are operating in North America, Europe and Japan.  Enron's broadband intermediation activity increased significantly, with over 580 transactions executed during the quarter – more than in all of 2000.  Enron also added 70 new broadband customers this quarter for a total of 120 customers.

59.    On July 12, 2001, Enron issued a press release announcing its financial results for the second quarter of 2001, the period ending June 30, 2001.  The Company reported diluted earnings of $0.45 per share.  Defendant Skilling downplayed any concerns investors might have about Broadband Services, stating in pertinent part as follows:

> In contrast to our extremely strong energy results, this was a difficult quarter in our broadband business.  However, our asset-light approach will allow us to adjust quickly to weak broadband industry conditions.  We are significantly reducing our broadband cost structure to match the reduced revenue opportunities currently available.

60.    On July 25, 2001, Bloomberg Business News reported that at a meeting with analysts, defendant Skilling stated that Enron will meet or beat its profit projections.  The article stated in pertinent part:

> "We will hit those numbers, and we will beat those numbers," Skilling told a meeting of analysts and investors in New York . . . .

> Analysts have also cited concern about unpaid power bills by Enron customers in California and India, and losses by Enron's broadband trading unit, which may hurt Enron's profits.

> "All of these are bunk," Skilling said.  "These are not issues for this stock."

F:\Fleming Law Docs\Enr12276 Complaint#2 gsj 11-12-01.doc    19

61.   ·On August 14, 2001, Enron issued a press release announcing that defendant Skilling had resigned his positions at the Company.  This announcement surprised investors and the price of Enron common stock dropped in response.  According to a report carried by Bloomberg Business News, on August 17, 2001, after the announcement of defendant Skilling's resignation, defendant Lay met with investors and analysts "to calm fears that the Company may be hiding dire financial news . . . ."  The article quoted an analyst from UBS Waburg as stating: "Ken met with us to reassure us that there is nothing wrong with the company . . . . There is no other shoe to fall, and no charges to be taken."

62.   Then, on August 29, 2001, defendant Lay provided an interview to Bloomberg Business News which was carried on the newswires.  Defendant Lay portrayed the Broadband Services Division in highly positive terms.  The following question/answer is illustrative:

> Johnson:  There has been a lot of concern by investors recently over the company's broadband trading unit, which trades space on fiber optic networks. Where does Enron stand with fiber optic trading now?  Have you – do you still remain hopeful in that sector?  Or what's the outlook now?
>
> Lay:  Why, no, that continues to grow, quarter-to-quarter, at a very good rate, so we're continuing to develop liquidity in the marketplace.  I mean, the biggest single problem has been the shortage of creditworthy counter parties to do longer term transactions.  But certainly, quarter-to-quarter, we continue to increase the number of trades rather significantly.

63.   The statements referenced above in ¶¶51-56 and 58-62 above, were each materially false and misleading when made as they misrepresented and/or omitted the following adverse facts which then existed and disclosure of which was necessary to make the statements made not false and/or misleading, including:

> (a)   that Broadband Services was experiencing declining demand for bandwidth and the Company's efforts to create a trading market for bandwidth were not meeting with success as many of the market participants were not creditworthy;

(b)    that the Company's operating results were materially overstated as a result of the Company failing to timely write-down the value of its investments with LJM Cayman LP and LJM2 Co-Investment LP;

(c)    that Enron was failing to write-down impaired assets on a timely basis in accordance with GAAP; and

(d)    as a result of the foregoing, defendants' earnings projections and statements about the Company's prospects and outlook were lacking in a reasonable basis at all times.

## The Results

64.    On October 16, 2001, Enron surprised the market by announcing that the Company was taking non-recurring charges of $1.01 billion after-tax, or ($1.11) loss per diluted share, in the third quarter of 2001, the period ending September 30, 2001.  Defendant Lay commented on the substantial charge, stating:

> After a thorough review of our businesses, we have decided to take these charges to clear away issues that have clouded our performance and earnings potential of our core energy businesses.

The press release further detailed the charge as follows:  $287 million related to asset impairments recorded by Azurix Corp.; $180 million associated with the restructuring of the Company's Broadband Services division; $544 million related to losses with certain investments and early termination during the third quarter of certain structured finance arrangements with a previously disclosed entity.

65.    An article in The Wall Street Journal, on October 17, 2001, further explained the nature of the "structured finance arrangements with a previously disclosed entity," which was mentioned in the Company's earnings release.  According to the article, the structured finance

arrangements involved limited partnerships that were managed by Enron's Chief Financial Officer, defendant Fastow. The article stated in pertinent part as follows:

> The two partnerships, LJM Cayman LP and the much larger LJM2 Co-Investment LP, have engaged in billions of dollars of complex hedging transactions with Enron involving company assets and millions of shares of Enron stock. It isn't clear from Enron filings with the Securities and Exchange Commission what Enron received in return for providing these assets and shares. In a number of transactions, notes receivable were provided by partnership-related entities.

66.    According to The Wall Street Journal, in a news report on October 17, 2001, the cryptic reference in the press release was to the "pair of limited partnerships that until recently were run by Enron's chief financial officer." According to The Wall Street Journal, Enron privately acknowledged (initially) that its transactions with those partnerships resulted in write-downs of $35 million.

67.    The next day, on October 18, 2001, The Wall Street Journal further reported on the nature of defendant Fastow's financial arrangements with the Company. The article reported that "Enron had shrank its shareholder equity by $1.2 billion as the Company had decided to repurchase 55 million of its shares that it had issued as part of a series of complex transactions with an investment vehicle" connected to defendant Fastow. The article stated in pertinent part as follows:

> According to Rick Causey, Enron's chief accounting officer, these shares were contributed to a "structured finance vehicle" set up about two years ago in which Enron and LJM2 were the only investors. In exchange for the stock, the entity provided Enron with a note. The aim of the transaction was to provide hedges against fluctuating values in some of Enron's broadband telecommunications and other technology investments.

68.    Defendants did not acknowledge, however, until October 17, 2001, that the $1.2 billion writedown was attributable to Enron's transactions with Fastow's investment partnerships. On October 18, 2001, The Wall Street Journal reported that in a conference call on

October 17, 2001, Defendant Lay stated that 55 million shares had been repurchased by Enron, as the Company "unwound" its participation in the transactions with the limited partnerships.

69.    Defendants failed to disclose this huge reduction in assets and shareholder's equity attributable to Enron's transactions with the investment partnerships, either in the October 16, 2001 press release or on the October 16, 2001 conference call, in an apparent admission of guilt of their wrongful conduct.

70.    The price of Enron common stock fell sharply on these disclosures.  On October 17, 2001, the price declined approximately 5% to a closing price of $32.20 per share on volume of more than 5 million shares.  On October 18, 2001, the price dropped approximately 10% to close at $29 per share with over 9 million shares trading.  According to Reuters news service, "Enron Corp. stock fell sharply on [October 18] as investors digested news of a $1.2 billion reduction in the energy giant's shareholder equity that attracted little attention when it was first disclosed earlier this week."

71.    Enron's October 16, 2001 announcement and the continual "un-weaving" of Enron's business dealings prompted further concerns for investors regarding Enron's financial status.  On November 6, 2001 Fitch Inc. downgraded Enron's senior unsecured debt to triple-B-minus from triple-B-plus, just a notch above junk bond or high-yield status.  The prior week, Standard & Poor's Corp. lowered its credit rating on Enron to triple-B while Moody's Investors Service lowered its rating to Baa2.

72.    On November 8, 2001, Enron announced it was restating its finances as far back as 1997 to account for losses related to a number of complex partnerships resulting in a $586 million reduction in net income, an additional $2.5 billion in debt and 77-cent reduction in earning per share.  This news prompted John Olson, an analyst with Sanders Morris Harris to

state: "At the end of the day these details give support to the fear that Enron was a financial house of cards." In trading, Enron's stock closed at $8.63 on November 9, 2001.

73. On Friday evening, November 9, 2001, Enron's rival in the energy trading business, Dynegy announced it would acquire Enron. Dynegy agreed to purchase Enron stock for an estimated $8.9 billion and assume $12.8 billion in Enron debt. Shareholders will receive 0.2685 share of Dynegy stock per Enron stock, an estimated $10.41 per Enron share.

74. As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; new that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set for the elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Enron, their control over, and/or receipt and/or modification of Enron's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Enron, participated in the fraudulent scheme alleged herein.

75. Defendants' scienter is further evidenced by the insider selling of certain of the Individual Defendants and other Enron Insiders. This trading was unusual and suspicious given its timing and amount as follows:

> Defendant Lay: sold 84,714 shares from Jan. 2 to Jan 31 for $68.28 to $82 each, or more than $5.78 million; sold 80,680 shares from Dec. 1 to Dec. 29 for $67.19 to $84.06 each, or more than $5.42 million. The sales total $11.2 million.

> Defendant Skilling: sold 50,000 shares from Jan. 3 to Jan. 31 for $68.94 to $80.28 each, or more than $3.45 million; sold 20,000 shares from Dec. 20 to Dec. 27 for $79.03 to $83 each, or more than $1.58 million, and 20,000 shares from

Dec. 6 to Dec. 13 for $68.91 to $77.06, or $1.38 million. The sales total $6.41 million.

Mark Frevert, Enron Wholesale Services chairman and chief executive: sold 180,000 shares from Dec. 18 to Dec. 20 for $79 to $79.98 each, or more than $14.2 million. The sale brought his holdings to 223,771 shares.

Cliff Baxter, Enron vice chairman and chief strategy officer, who sold 174,215 shares from Jan. 2 to Jan. 31 for $69.44 to $81.31 each, or more than $12.10 million. The sale brought his holdings to 7,877 shares.

Ken Rice, chairman and chief executive of Enron Broadband Services, Inc.: sold 32,000 shares from Jan. 3 to Jan. 31 for $68.19 to $82 each, or more than $12.10 million; sold 100,000 shares on Dec. 13 to $76.69 each, or $7.67 million. The sales total $9.185 million and brought Rice's holdings to 113,127 shares.

Steve Kean, Enron executive vice president and chief of staff: sold 77,822 shares on Jan 31 for $79.84 to $80 each, or more than $6.21 million. The sale brought his holdings to 26,363 shares.

Stanley Horton, chairman and chief executive of Enron Gas Pipeline Group and EOTT Energy Partners-LP: sold 25,000 shares January 29 for $80.51 each, or $1.02 million, and 25,000 shares Dec. 27 for $80.96 each, or $2.02 million. The sales total $4.04 million and brought his holdings to 144,217 shares.

Richard Buy, Enron executive vice president and chief risk officer; sold 47,724 shares from Jan. 2 to Jan. 26 for $81.90 to $82 each, or $3.91 million. The sale brought his holdings to 9,257 shares.

In total, the insider selling by defendants Skilling and Lay and the other Enron insiders totals more than $73 million.

76.     At all relevant times, the market for Enron's securities was an efficient market for the following reasons, among others:

77.     Enron's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

78.     As a regulated issuer, Enron filed periodic public reports with the SEC and the NYSE;

79. Enron regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

80. Enron was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

81. As a result of the foregoing, the market for Enron's securities promptly digested current information regarding Enron from all publicly available sources and reflected such information in Enron's stock price. Under these circumstances, Plaintiffs suffered injury through their purchase of Enron's securities at artificially inflated prices and a presumption of reliance applies.

### No Safe Harbor

82. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purported forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Enron who knew that those statements were false when made.

## COUNT I
### Against All Defendants for Violation of
### Sections 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

83. Plaintiffs incorporate by reference and re-allege each of the foregoing allegations.

84. The Defendants, individually and in concert, engaged in a plan, scheme, and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud upon Plaintiffs and made various untrue and deceptive statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs as set forth above. The purpose and effect of this scheme was to induce Plaintiffs to purchase Enron common stock at artificially inflated prices.

85. Defendants, pursuant to their plan, scheme and unlawful course of conduct, knowingly and/or recklessly issued, or caused to be issued statements to the investing public as described above.

86. Defendants knew and/or recklessly disregarded the falsity of the foregoing statements. As senior officers and/or directors of the Company, the Individual Defendants had access to the non-public information detailed above.

87. Enron acted through the Individual Defendants, whom it portrayed and represented to the press and public as its valid representatives. The willfulness, motive, knowledge, and recklessness of the Individual Defendants are therefore imputed to Enron, which is primarily responsible for the securities law violations of the Individual Defendants while

acting in their official capacities as Company representatives, or, in the alternative, which is liable for the acts of the Individual Defendants under the doctrine of *respondeat superior*.

88.    Each of the defendants knew or recklessly disregarded the fact that the above acts and practices, misleading statements, and omissions would adversely affect the integrity of the market in Enron common stock.  Had the adverse facts defendants concealed been properly disclosed, Enron's shares would not have sold at the artificially inflated prices they did.

89.    As a result of the foregoing, the market price of Enron common stock was artificially inflated.  In ignorance of the false and misleading nature of the representations, Plaintiffs relied, to their detriment, on the integrity of the market as to the price of Enron common stock.

90.    Had Plaintiffs and the marketplace known of the true operating and financial results of Enron, which, due to the actions of Defendants were not disclosed, Plaintiffs would not have purchased or otherwise acquired their Enron common stock or, if they had acquired Enron common stock, they would not have done so at the artificially inflated prices at which they purchased their stock.  Hence, Plaintiffs were damaged by said Defendants' violations of Section 10(b) and Rule 10b-5.

91.    Plaintiffs were injured because the risks that materialized were risks of which they were unaware as a result of Defendants' misrepresentations, omissions and other fraudulent conduct alleged herein.  The decline in the price of Enron's common sock was caused by the public dissemination on or about October 16, 2001 of the true facts, which were previously concealed or hidden.  Absent said Defendants' wrongful conduct, Plaintiffs would not have been injured.

92.    The price of Enron common stock declined materially upon public disclosure of the true facts which had been misrepresented or concealed, as alleged in this complaint. Plaintiffs have suffered substantial damages as a result of the wrongs alleged herein.

93.    By reason of the foregoing, defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**
**Against the Individual Defendants**
**For Violations of Section 20(a) of the Exchange Act**

94.    Plaintiffs incorporate by reference and re-allege each of the foregoing allegations.

95.    By reason of their status as officers, members of senior management and/or directors of Enron, the Individual Defendants were "controlling persons" of Enron within the meaning of Section 20 of the Exchange Act and had the power and influence to cause Enron to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Enron's business, the information contained in its filings with the SEC and public statements about its business. The Individual Defendants were provided with or had unlimited access to copies of the Companies' internal reports, and press releases and public filings alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Enron was controlled by the Individual Defendants.

96.    In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and therefore, are presumed to have had the power to control or influence the particular statements giving rise to the securities violations as alleged herein, and exercised the same.

97.　As set forth above in Count I, Enron violated Section 10(b) and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Enron, the Individual Defendants are liable for the Company's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as alleged in Count I, pursuant to Section 20(a) of the Exchange Act.

98.　As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Company's common stock.

### COUNT III
### Against the Individual Defendants
### For Breach of Fiduciary Duty of Loyalty

99.　Plaintiffs incorporate by reference and re-allege each of the foregoing allegations.

100.　As directors and officers of Enron, the Defendants owe a duty of loyalty to Plaintiffs as shareholders. This duty of loyalty requires them at all times to serve Enron's best interests, and not to place the interests of any other entity or person in which they are personally interested above those of Enron's shareholders.

101.　The Director Defendants breached their duty of loyalty to Enron because they allowed and approved the structure of the financial transactions with LJM and LJM2. In these transactions, the interests of LJM, LJM2, and Fastow conflict with the interests of Enron. By approving the financial relationships, the Director Defendants inappropriately acted for the interests of other entities, and created a circumstance where the interests of Enron's CFO were adverse to Enron, all at the expense of Plaintiffs.

102.　Defendant Fastow breached his duty of loyalty to Enron by forming LJM and LJM2 to engage in substantial transactions with Enron. Fastow's active and central role as the

managing member of the general partner of these two investment partnerships severely compromised the duty of loyalty he owes, as Enron's CFO, to Enron and Enron's shareholders.

103. By reason of the Defendants' breach of the fiduciary duty of loyalty to Plaintiffs, as set forth above, Plaintiffs have suffered damages in an amount in excess of the minimum jurisdictional limits of this Court.

104. The Defendants Glisan and Mordaunt have been discharged by Enron for self-dealing, but the nature and extent of their self-dealing is as of the date of this filing unknown to Plaintiffs.

105. As a result of their breach of the fiduciary duty of loyalty, the Defendants are liable to Plaintiffs for both actual and punitive damages commensurate with their losses.

## COUNT IV
### Against Arthur Andersen
### for Negligence & Securities Act Violations

106. Plaintiffs incorporate by reference and re-allege each of the foregoing allegations.

107. The accounting firm of Arthur Andersen, L.L.P. ("AALLP") was hired by Enron with the approval of its directors to provide the accounting data necessary for compliance with state and federal securities statutes. As a result AALLP owed a duty of full and complete disclosure to shareholders in Enron, as well as regulatory authorities. AALLP breached that duty by failing to fully and adequately disclosed Enron's debt positions by overstating Enron's net income for each year beginning in 1997 and by failing to fully and adequately disclose Enron's involvement with private investment limited partnerships formed by Enron executives. All of these actions or inactions violated generally accepted principles of accounting, (GAAP).

108. For instance, based on information and belief, the Defendant Fastow formed L-JM Cayman, L.P. (LJM1) and LJM2 Co. – Investment, L.P. (LJM2), private investment

limited partnerships which affected the equity of shareholders such as Plaintiffs through its transactions with Enron. These transactions were not adequately reflected in the filings done or overseen by AALLP and were not reported by AALLP in accordance with standard accounting practices or as required by state and federal securities acts.

109. The financial activities of Chewco Investments, L.P. ("Chewco"), an investor in Joint Energy Development Investments Limited Partnership ("JEDI") should have been consolidated with Enron beginning in 1997. The failure to consolidate Chewco caused a false financial picture to be given to shareholders such as Plaintiffs. The Plaintiffs relied to their detriment on the financial statements prepared by AALLP in either purchasing their shares or retaining them. The directors of Enron also failed to properly disclose these transactions to the public.

110. The financial activities of JEDI should have been consolidated into Enron's financial statements prepared by AALLP beginning in 1997 causing a false financial picture to be given of Enron to its investors such as Plaintiffs. Such failure amounted to a violation of generally accepted accounting practices by AALLP and resulted in damages to Plaintiffs because of the loss of value of their shares. The directors failed to require full disclosure of these transactions to the public.

111. The financial activities of LJM1 which engaged in derivative transactions with Enron to permit Enron to hedge market risks also should have been consolidated into Enron's financial statements beginning in 1999. The failure to do so amounted to negligence on the part of AALLP and resulted in losses to Plaintiffs. Such failure by AALLP was also a violation of generally accepted accounting practices. The cover-up by AALLP of these transactions

constituted gross negligence entitling these Plaintiffs to recovery of punitive damages. This cover-up was continued by the directors until October, 2001.

112. Four SPE's known as Raptor I-IV (collectively "Raptor") were created in 2000 permitting Enron to hedge market risk in certain of its investments. Under generally accepted accounting principles, the note receivable from Raptor should have been included as a reduction to shareholders equity. The net effect of this accounting entry done by AALLP was to overstate both notes receivable and shareholders' equity by approximately $172,000,000.00. Their transactions were also approved by the named directors, who also failed to require their full and complete disclosure.

113. These failures on the part of AALLP each constituted negligence and were a proximate cause of the precipitous drop in the value of Plaintiffs' shares in Enron. All of the above transactions and the failure of AALLP to properly record and document them constituted a violation of both federal and state security laws and GAAP. Each of the Plaintiffs herein suffered monetary losses because of their reliance on the accounting reports and audits of AALLP for which they seek actual and punitive damages.

WHEREFORE, Plaintiffs pray for judgment as follows:

    a.    Awarding Plaintiffs compensatory damages, together with appropriate prejudgment interest at the maximum rate allowable by law;

    b.    Awarding Plaintiffs their costs and expenses for this litigation including reasonable attorneys' fees and other disbursements;

    c.    Awarding Plaintiffs both additional damages as allowed by state and federal statutes and punitive damages for fraud and gross negligence; and

    d.    Granting such other and further relief as this Court deems to be just and proper.

Dated: November 13, 2001.

Respectfully submitted,

**FLEMING & ASSOCIATES, L.L.P.**
G. Sean Jez
State Bar No. 00796829
Federal No.  20622
George M. Fleming
State Bar No. 07123000
Federal No. 17974
1330 Post Oak Blvd., Suite 3030
Houston, Texas  77056-3019
Tel. No.:  (713) 621-7944
Fax No.:  (713) 621-9638

By_____
   G. Sean Jez

**ATTORNEYS FOR PLAINTIFFS**

**JURY TRIAL DEMANDED BY EACH PLAINTIFF**