IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE ENRON CORP. SECURITIES, DERIVATIVE & "ERISA" LITIGATION | § § § | MDL DOCKET NO. 1446 |
| MARK NEWBY, ET AL. | § § | |
| v. | § § | COORDINATED AND CONSOLIDATED LEAD NO. H-01-3624 |
| ENRON CORP., ET AL. | § § | |
| **THIS DOCUMENT RELATES TO:** | § § | |
| JOHN AND PEGGY ODAM, ET AL. | § § | |
| v. | § § | C.A. NO. H-01-3914 CONSOLIDATED |
| ENRON CORPORATION, ET AL. | § § | |

## **PLAINTIFF'S AMENDED COMPLAINT**

COME NOW Plaintiff Peggy Odam, Individually, and as Trustee for the Kurtz Family

Trust with this her Amended Complaint, complaining of Defendants Arthur Andersen, L.L.P.

("Andersen"); Thomas H. Bauer; Michael L. Bennett; Joseph F. Beradino; Debra A. Cash; David

B. Duncan; James A. Friedlieb; D. Stephen Goddard, Jr.; Gary B. Goolsby; Michael M. Lowther;

Michael C. Odom; Roger Willard; Robert A. Belfer; Norman P. Blake, Jr.; Richard B. Buy;

Richard Causey; Ronnie C. Chan; John H. Duncan; Andrew S. Fastow; Joe H. Foy; Ben Glisan;

Wendy L. Gramm, M.D.; Kevin Hannon; Ken L. Harrison; Joseph M. Hirko; Kevin Howard;

Robert K. Jaedicke; Mark E. Koenig; Michael J. Kopper; Estate of Kenneth L. Lay; Charles A.

LeMaistre; Rebecca Mark-Jusbasche; Jeffrey McMahon; John Mendelsohn; Jerome J. Meyer;

Kristina Mourdaunt; Lou Pai; Paulo V. Ferraz Pereira; Kenneth D. Rice; Frank Savage; Jeffrey

K. Skilling; John A. Urquhart; John Wakeham; Charles E. Walker; Lawrence Greg Whalley;

Herbert S. Winokur, Jr.; F. Scott Yeager; Daniel Boyle; J.P. Morgan Chase & Co.; J.P. Morgan Securities, Inc. (formerly known as Chase Securities, Inc.); J.P. Morgan Chase Bank; Credit Suisse First Boston Inc.; Credit Suisse First Boston (USA), Inc.; Credit Suisse First Boston L.L.C. (f/k/a Credit Suisse First Boston Corp.); Campsie, Ltd.; Chase Securities, Inc.; Citibank, N.A.; Citicorp; Citicorp Global Markets, Ltd. (f/k/a Salomon Brothers International, Ltd.); Citicorp North America; Citicorp Global Markets, Inc. (f/k/a Salomon Smith Barney, Inc.); Citigroup, Inc.; National Westminster Bank PLC; RBC Dominion Securities Corp.; RBC Dominion Securities, Inc.; RBC Dominion Securities, Ltd. RBC Holdings (USA) Inc.; Royal Bank DS Holding, Inc.; Royal Bank Holding, Inc.; Royal Bank of Canada; The Royal Bank of Scotland Group PLC; The Royal Bank of Scotland PLC; Greenwich Natwest Ltd.; Greenwich Natwest Structured Finance, Inc.; Citicorp North Pershing LLC (f/k/a Donaldson Lufkin & Jenrette Securities Corp.); Canadian Imperial Bank of Commerce; CIBC Inc.; CIBC World Markets Corp.; Merrill Lynch, Pierce, Fenner & Smith Inc. a/k/a Merrill Lynch & Co.; Bank of America Corp.; Bank of America, N.A.; Banc of America Securities LLC; Barclays PLC; Barclays Bank PLC; Lehman Brothers Holdings, Inc.; Lehman Brothers, Inc.; Daniel H. Bayly; James A. Brown; Robert S. Furst; William Fuhs; and Schuyler Tilney.  In support thereof, they would show the following:

## I.      Parties

1.       Plaintiff **Peggy Odam**, **Individually, and as Trustee for the Kurtz Family Trust** is a citizen of the State of Texas who owns or has owned Enron common stock.

2.       Defendant **Arthur Andersen, L.L.P.** ("Andersen") is a limited liability partnership.  Defendant Andersen audited and certified Enron's financial statements from 1997 through 2001.

Oda12898 Amd Complaint Fi gsj 08-17-06                    2

3.      Defendant **Thomas H. Bauer** ("Bauer") was a partner of the Houston, Texas office of Arthur Andersen, L.L.P. who was in charge of the Enron account in which he and others conducted the external and internal audits and accounting of Enron's records, books, financial statements, annual and quarterly SEC filings.  Bauer oversaw commodity trading at Enron and worked exclusively on Enron matters.

4.       Defendant **Michael L. Bennett** ("Bennett") was a partner of the Houston, Texas office of Arthur Andersen, L.L.P. and a central participant in the Enron audit in which he and others conducted the external and internal audits and accounting of Enron's records, books, financial statements, annual and quarterly SEC filings.

5.      Defendant **Joseph F. Beradino** ("Beradino") was the Chief Executive Officer and managing partner of Andersen Worldwide.  Beradino approved the destruction of Enron-related documents.  He also engaged and reviewed the audits of Enron through his interactions with David Duncan.

6.      Defendant **Debra A. Cash** ("Cash") was a partner and head of the energy unit in the Houston, Texas office of Arthur Andersen, L.L.P.  Cash and others conducted the external and internal audits and accounting of Enron's records, books, financial statements, annual and quarterly SEC filings.

7.      Defendant **David B. Duncan** ("Duncan") was the head Andersen partner on the Enron engagement and was a partner in both Andersen Worldwide and Arthur Andersen, L.L.P. and served on the Chairman's Advisory Counsel, an elite group of twenty-one worldwide partners.  Duncan and others conducted the external and internal audits and accounting of Enron's records, books, financial statements, annual and quarterly SEC filings.  Defendant was discharged by Andersen for destroying documents relevant to the Enron audits.  Duncan has

pleaded guilty to the destruction of documents connected with the audit of Enron's books and has admitted in open court that he knew that the documents he had destroyed were relevant to legitimate government inquiries about the audits of Enron Corp. and its subsidiaries.

8.      Defendant **James A. Friedlieb** ("Friedlieb") was a partner in Andersen Worldwide's Chicago headquarters, a partner in Andersen Worldwide and Arthur Andersen, L.L.P.  Friedlieb and others conducted the external and internal audits and accounting of Enron's records, books, financial statements, annual and quarterly SEC filings.

9.      Defendant **D. Stephen Goddard, Jr.** ("Goddard") was office managing partner of the Houston, Texas office of Arthur Andersen, L.L.P. from 1997 until 2001.  Goddard was also head of Arthur Andersen's Audit & Business Advisory and Energy practice for the Houston office, a significant participant in the Enron audit and consulting engagements, the managing partner for the Gulf Coast Market Circle and a partner in both Andersen Worldwide and Arthur Andersen, L.L.P.  Goddard conducted the external and internal audits and accounting of Enron's records, books, financial statements, annual and quarterly SEC filings.

10.      Defendant **Gary B. Goolsby** ("Goolsby") was in charge of Global Risk Management and was Consulting Practice Director of Arthur Andersen, L.L.P's Houston office. Goolsby was an essential member of the Enron audit and consulting engagements and was responsible for the external and internal audits and accounting of Enron's records, books, financial statements, annual and quarterly SEC filings.

11.      Defendant **Michael M. Lowther** ("Lowther") was Arthur Andersen's concurring partner on the Enron audit since 1997 and a partner in both Andersen Worldwide and Arthur Andersen, L.L.P.  He and others conducted the external and internal audits and accounting of Enron's records, books, financial statements, annual and quarterly SEC filings.

12.     Defendant **Michael C. Odom** ("Odom") was a partner of Arthur Andersen, L.L.P. based in their Houston office and a significant member of the Enron audit.  He and others conducted the external and internal audits and accounting of Enron's records, books, financial statements, annual and quarterly SEC filings.

13.     Defendant **Roger Willard** ("Willard") is a partner of the Houston, Texas office of Arthur Andersen, L.L.P., a member of the Audit and Business Advisory practice and in charge of the Enron account in which he and others conducted the external and internal audits and accounting of Enron's records, books, financial statements, annual and quarterly SEC filings.

14.     Defendant **Robert A. Belfer** ("Belfer") served as a Director of Enron from 1983 until 2002 and served on its Executive Committee and Finance and Compensation Committees. Belfer executed the 1997, 1998, 1999 and 2000 financial statements of Enron.

15.     Defendant **Norman P. Blake, Jr.** ("Blake") served as a Director of Enron from 1993 until 2002 and served on the Finance and Compensation Committees.  Blake executed the 1997, 1998, 1999 and 2000 financial statements of Enron.

16.     Defendant **Richard B. Buy** ("Buy") was the Executive Vice President and Chief Risk Officer of Enron after serving as Senior Vice President and Chief Risk Officer from March 1999 through July 1999.  He also served as the Management Director and Chief Risk Officer of Enron Capital & Trade (ECT) from January 1998 until March 1999.

17.     Defendant **Richard Causey** ("Causey") served as Executive Vice President and Chief Accounting Officer of Enron from January 1997 to February 2002.  Causey also served as an officer and/or director of New Power Corporation.

18.     Defendant **Ronnie C. Chan** ("Chan") served as an Enron director from 1996 until 2002 and was a member of the audit and compliance committee.  Chan has been Chairman of

Hang Lung Group, comprising three publicly traded Hong Kong-based companies involved in property development, property investment and hotels.  Mr. Chan also co-founded and is a director of various companies within Morningside/Springfield Group, which invests in and manages private companies in the manufacturing and service businesses, and engages in financial investments.  Mr. Chan is also a director of Standard Chartered PLC and Motorola, Inc.

19.     Defendant **John H. Duncan** ("Duncan") is a former Enron director beginning in 1985.  From 1990 until 2002, Duncan's principal occupation was investments.  Mr. Duncan is also a director of EOTT Energy Corp. (the general partner of EOTT Energy Partners, L.P.) and Group I Automotive Inc.

20.     Defendant **Andrew S. Fastow** ("Fastow") was Enron's former Executive Vice President and Chief Financial Officer having been originally hired at Enron on or about February 12, 1997.

21.     Defendant **Joe H. Foy** ("Foy") served as a member of the Audit Committee for Enron from 1997 until 1999.

22.     Defendant **Ben Glisan** ("Glisan") was a managing director and treasurer of Enron until November of 2001.  Defendant was discharged for self-dealing the week of November 5, 2001.

23.     Defendant **Wendy L. Gramm, M.D.** ("Gramm") was an Enron director from 1993 until 2002 and was a member of the audit and compliance committee.  Dr. Gramm is an economist and Director of the Regulatory Studies Program of the Mercatus Center of George Mason University.  From February 1988 until January 1993, Dr. Gramm served as Chairman of the Commodity Futures Trading Commission in Washington, D.C. and is also a director of IBP,

Inc., State Farm Insurance Co. and Invesco Funds. Dr. Gramm was also a director of the Chicago Mercantile Exchange until December 31, 1999.

24. Defendant **Kevin Hannon** ("Hannon") is a former President of Enron Broadband Services, Inc. (EBS).

25. Defendant **Ken L. Harrison** ("Harrison") served as Chief Executive Officer of Portland General Electric (an Enron subsidiary) and as a Director for Enron from 1997 until 2001. Harrison executed the 1997, 1998, 1999 and 2000 financial statements of Enron.

26. Defendant **Joseph M. Hirko** ("Hirko") was Chief Executive Officer of EBS from 1997 until June 2000.

27. Defendant **Kevin Howard** ("Howard") served as Chief Financial Officer of EBS.

28. Defendant **Robert K. Jaedicke** ("Jaedicke") was an Enron director from 1985 until 2002 and once served as the chairman of the audit and compliance committee. Jaedicke is Professor (Emeritus) of Accounting at the Stanford University Graduate School of Business in Stanford, California.

29. Defendant **Mark E. Koenig** ("Koenig") served as Executive Vice President, Investor Relations of Enron.

30. Defendant **Michael J. Kopper** ("Kopper") served as managing director of Enron's Global Equity Markets Group.

31. Defendant **Estate of Kenneth L. Lay** ("Lay") has been an Enron director since 1985, until his resignation in 2002. Lay was Chairman of the Board of Enron from 1986 to 2002. From 1986 until February 2001, Lay was also the Chief Executive Officer of Enron. On August 14, 2001, Lay became President and CEO of Enron upon the surprise resignation of defendant Skilling, as further described below.

32. Defendant **Charles A. LeMaistre** ("LeMaistre") was an Enron director from 1985 until 2002. LeMaistre served as President of the University of Texas M.D. Anderson Cancer Center in Houston, Texas and now holds the position of President Emeritus.

33. Defendant **Rebecca Mark-Jusbasche** ("Mark-Jusbasche") was an Enron director from 1999 until 2000. Mark-Jusbasche executed the 1999 financial statements of Enron.

34. Defendant **Jeffrey McMahon** ("McMahon"), after being Senior Vice President, Finance and Treasurer from July 1998 through July 1999, served as Executive Vice President, Finance and Treasurer. McMahon also served as CFO of Enron Europe from 1994 through July 1998.

35. Defendant **John Mendelsohn** ("Mendelsohn") was an Enron director from 1999 until 2002 and was a member of the audit and compliance committee. Mendelsohn has served as President of the University of Texas M.D. Anderson Cancer Center. Prior to 1996, Dr. Mendelsohn was Chairman of the Department of Medicine at Memorial Sloan-Kettering Cancer in New York. Mendelsohn is also a director of ImClone Systems, Inc.

36. Defendant **Jerome J. Meyer** ("Meyer") served as an Enron director from 1997 through 2002, serving on the Finance Committee and Nominating Committee. Meyer executed the 1997, 1998, 1999 and 2000 financial statement of Enron.

37. Defendant **Kristina Mourdaunt** ("Mourdaunt") was a managing director and general counsel of EBS until November of 2001. Defendant was discharged for self-dealing the week of November 5, 2001.

38. Defendant **Lou Pai** ("Pai") served as an Enron director at all times relevant to this lawsuit. Pai was also the Chairman and CEO of Enron Xcelerator until the end of 2000 after serving as Chairman of Enron Energy Services (Enron's retail energy services business).

39.     Defendant **Paulo V. Ferraz Pereira** ("Pereira") served as Enron director from 1999 though 2002 and was a member of the audit and compliance committee.

40.     Defendant **Kenneth D. Rice** ("Rice") began serving as Chairman and Chief Executive Officer of EBS in June 2000 and served as Chairman and Chief Executive Officer of ECT-North America from March 1997 until June 1999.

41.     Defendant **Frank Savage** ("Savage") served as an Enron director from 1999 until 2002.

42.     Defendant **Jeffrey K. Skilling** ("Skilling") was an Enron director at all times relevant to this lawsuit.  Skilling served as President and Chief Executive Officer of Enron from February 2001 through August 14, 2001, when he announced his unexpected resignation from the offices of both President and CEO at the time of his resignation, he gave up millions in stock options and bonuses that he would have received if he had continued his employment.  It was also announced on that date that Skilling would remain on the Board of Directors, and that he would serve as a consultant to the Company through the year 2005.  Skilling, however, resigned from the board in 2002.  Skilling served as President and Chief Operating Officer of Enron from January 1997 through February 2001.  From August 1990 until December 1996, he served as Chairman and Chief Executive Officer of Enron North America Corp. and its predecessor companies.  Skilling was also a director of the Houston Branch of the Federal Reserve Bank of Dallas during the periods relevant to this case.

43.     Defendant **John A. Urquhart** ("Urquhart") served as Director of Enron from 1990 through 2001, serving on the Finance Committee.  Urquhart executed the 1997, 1998, 1999 and 2000 financial statements of Enron.

44.    Defendant **John Wakeham** ("Wakeham") served as an Enron director from 1994 until 2002.  Wakeham served as a member of the audit and compliance committee.  Wakeham is a retired former U.K. Secretary of State for Energy and Leader of the Houses of Commons and Lords.  He served as a Member of Parliament from 1974 until his retirement from the House of Commons in April 1992.  Prior to his government service, Lord Wakeham managed a large private practice as a chartered accountant.  He is currently Chairman of the Press Complaints Commission in the U.K. and chairman and director of a number of publicly traded U.K. companies.

45.    Defendant **Charles E. Walker** ("Walker") served as a Director of Enron from 1995 until 1998, serving on the Finance Committee and Nominating Committee, including as Chairman.  Walker executed the 1997 and 1998 financial statements of Enron.

46.    Defendant **Lawrence Greg Whalley** ("Whalley") served as President and Chief Operating Officer of Enron Corporation in 2001 and prior to that served as Chairman and Chief Executive Officer of Enron Europe from March 1997 through June 2000.

47.    Defendant **Herbert S. Winokur** ("Winokur") was an Enron director from 1985 until 2002.  Winokur is Chairman and Chief Executive Officer of Capricorn Holdings, Inc. (a private investment company) and Managing General Partner of Capricorn Investors, L.P., Capricorn Investors II, L.P. and Capricorn Investors III, L.P., partnerships concentrating on investments in restructure situations, organized by Mr. Winokur in 1987, 1994 and 1999, respectively.  From August 2000 until March 2001, Mr. Winokur served as Non-executive Chairman of Azurix Corp.  Prior to his current appointment, Mr. Winokur was Senior Executive Vice President and a director of Penn Central Corporation.  He is also a director of NATCO

Group, Inc., Mrs. Fields' Holding Company, Inc., CCC Information Services Group, Inc. and DynCorp.

48.    Defendant **F. Scott Yeager** ("Yeager") served as Senior Vice President of Business Development at EBS.

49.    Defendant **Daniel Boyle** ("Boyle") was an employee of Enron beginning in August 1998, rising to the position of Vice President in Global Finance.

50.    Defendant **J.P. Morgan Chase & Co.** is a corporation incorporated under the laws of the State of Delaware and is the successor-in-interest to J.P. Morgan & Co. Inc. and The Chase Manhattan Corporation, which merged on or about December 31, 2000.  Defendant **J.P. Morgan Securities, Inc. (f/k/a Chase Securities, Inc.)** is a corporation incorporated under the laws of the State of Delaware.  Defendant **J.P. Morgan Chase Bank**, the successor to The Chase Manhattan Bank, The Chase Manhattan Bank, N.A. and Chemical Bank, is a New York State banking corporation.  Defendant **Chase Securities Inc.** is a corporation incorporated under the laws of the State of Delaware.  The Defendants identified in this paragraph are referred to collectively as "J.P. Morgan" or the "J.P. Morgan defendants."  The J.P. Morgan defendants acted in a coordinated manner, and each of the J.P. Morgan defendants acted with knowledge of the actions of other J.P. Morgan defendants, in connection with the services and other activities, described below, relating to Enron, the special purpose entities, the partnerships and the transactions at issue, such that each of the J.P. Morgan defendants may be deemed to be responsible for the activities of all of the J.P. Morgan defendants.

51.    Defendant **Citigroup, Inc.** is a corporation incorporated under the laws of the State of Delaware.  Defendant **Citicorp** is a corporation incorporated under the laws of the State of Delaware. Defendant **Citibank, NA.** is a nationally chartered bank and is a subsidiary of

Citigroup, Inc., with its principal place of business in New York, New York. Defendant **Citicorp North America, Inc.** is a corporation incorporated under the laws of the State of Delaware. Defendant **Citigroup Global Markets Inc. (formerly known as Salomon Smith Barney Inc.)** is a corporation incorporated under the laws of the State of New York. Defendant **Citicorp Global Markets Ltd. (formerly known as Salomon Brothers International Limited)** is a corporation incorporated under the laws of the United Kingdom, with its address at Citigroup Centre, Canada Square, London, England E14 5LB. The Defendants identified in this paragraph are referred to collectively as "Citigroup" or the "Citigroup defendants."

52.　The Citigroup defendants acted in a coordinated manner, and each of the Citigroup defendants acted with knowledge of the actions of other Citigroup defendants, in connection with the services and other activities, described below, relating to Enron, the special purpose entities, the partnerships and the transactions at issue, such that each of the Citigroup defendants may be deemed to be responsible for the activities of all of the Citigroup defendants.

53.　Defendant **Credit Suisse First Boston, Inc.** is a corporation incorporated under the laws of the State of Delaware. Defendant **Credit Suisse First Boston (USA), Inc.** is a corporation incorporated under the laws of the State of Delaware. Defendant **Credit Suisse First Boston LLC, formerly known as Credit Suisse First Boston Corp.**, is a limited liability company organized under the laws of the State of Delaware. Defendant **Pershing LLC (formerly known as Donaldson, Lufkin & Jenrette Securities Corporation)** is a limited liability company organized under the laws of the State of Delaware, and a wholly-owned subsidiary of Credit Suisse First Boston (USA), Inc.  The Defendants identified in this paragraph are referred to collectively as "CSFB" or "the CSFB defendants."

Oda12898 Amd Complaint Fi gsj 08-17-06　　　12

54. The CSFB defendants acted in a coordinated manner, and each of the CSFB defendants acted with knowledge of the actions of other CSFB defendants, in connection with the services and other activities, described below, relating to Enron, the special purpose entities, the partnerships and the transactions at issue, such that each of the CSFB defendants may be deemed to be responsible for the activities of all of the CSFB defendants.

55. Defendant **Canadian Imperial Bank of Commerce** is a corporation incorporated under the laws of Canada. Defendant **CIBC Inc.** is a corporation incorporated under the laws of the State of Delaware. Defendant **CIBC World Markets Corp.** is a corporation incorporated under the laws of the State of Delaware. The Defendants identified in this paragraph are referred to collectively as "CIBC" or the "CIBC defendants."

56. The CIBC defendants acted in a coordinated manner, and each of the CIBC defendants acted with knowledge of the actions of other CIBC defendants, in connection with the services and other activities, described below, relating to Enron, the special purpose entities, the partnerships and the transactions at issue, such that each of the CIBC defendants may be deemed to be responsible for the activities of all of the CIBC defendants.

57. Defendant **Bank of America Corp.** is a corporation incorporated under the laws of the State of Delaware. Defendant **Bank of America, N.A.** is a national banking association. Defendant **Banc of America Securities LLC** is a corporation incorporated under the laws of the State of Delaware. The Defendants identified in this paragraph are referred to collectively as "Bank of America" or the "Bank of America defendants."

58. The Bank of America defendants acted in a coordinated manner, and each of the Bank of America defendants acted with knowledge of the actions of other Bank of America defendants, in connection with the services and other activities described below, relating to

Oda12898 Amd Complaint Fi gsj 08-17-06          13

Enron, the special purpose entities, the partnerships and the transactions at issue, such that each of the Bank of America defendants may be deemed to be responsible for the activities of all of the Bank of America defendants.

59.    Defendant **Barclays PLC** is a United Kingdom entity.  Defendant **Barclays Bank PLC** is a United Kingdom entity.  The Defendants identified in this paragraph are referred to collectively as "Barclays" or the "Barclays defendants."

60.    The Barclays defendants acted in a coordinated manner, and each of the Barclays defendants acted with knowledge of the actions of other Barclays defendants, in connection with the services and other activities described below, relating to Enron, the special purpose entities, the partnerships and the transactions at issue, such that each of the Barclays defendants may be deemed to be responsible for the activities of all of the Barclays defendants.

61.    Defendant **Merrill Lynch, Pierce, Fenner & Smith Incorporated a/k/a Merrill Lynch & Co.** ("Merrill Lynch") is a corporation incorporated under the laws of the State of New York with its principal place of business in New York, New York.

62.    Defendant **The Royal Bank of Scotland Group PLC** is a United Kingdom entity. Defendant **The Royal Bank of Scotland PLC** is a United Kingdom entity. Defendant **National Westminster Bank PLC** is a United Kingdom entity.  Defendant **Greenwich NatWest Ltd.** is a United Kingdom entity. Defendant **Greenwich NatWest Structured Finance, Inc.** is a corporation incorporated under the laws of the State of Delaware.  Defendant **Campsie Ltd.** is a wholly-owned investment vehicle of The Royal Bank of Scotland Group PLC.  The Defendants identified in this paragraph are referred to collectively as "RBS" or the "RBS defendants."

63.     The RBS defendants acted in a coordinated manner, and each of the RBS defendants acted with knowledge of the actions of other RBS defendants, in connection with the services and other activities described below, relating to Enron, the special purpose entities, the partnerships and the transactions at issue, such that each of the RBS defendants may be deemed to be responsible for the activities of all of the RBS defendants.

64.     Defendant **Royal Bank of Canada** is a bank chartered under the laws of Canada. Defendant **Royal Bank Holding Inc.** is a corporation incorporated under the laws of Canada. Defendant **Royal Bank DS Holding Inc.** is a wholly-owned subsidiary of Royal Bank of Canada. Defendant **RBC Dominion Securities Ltd.** is an entity incorporated under the laws of Canada. Defendant **RBC Dominion Securities Inc.** is a corporation incorporated under the laws of Canada. Defendant **RBC Holdings (USA), Inc.** is a corporation incorporated under the laws of the State of New York. Defendant **RBC Dominion Securities Corp.** is a corporation incorporated under the laws of the State of New York. The Defendants identified in this paragraph are referred to collectively as "RBC" or the "RBC defendants."  Defendants will be served in accordance with the Texas Rules of Civil Procedure or by agreement of counsel.

65.     The RBC defendants acted in a coordinated manner, and each of the RBC defendants acted with knowledge of the actions of other RBC defendants, in connection with the services and other activities, described below, relating to Enron, the special purpose entities, the partnerships and the transactions at issue, such that each of the RBC defendants may be deemed to be responsible for the activities of all of the RBC defendants.

66.     Defendant **Lehman Brothers, Inc.** is a corporation incorporated under the laws of the State of Delaware.  Defendant **Lehman Brothers Holdings, Inc.** is a corporation incorporated under the laws of the State of Delaware.  The Defendants identified in this

Oda12898 Amd Complaint Fi gsj 08-17-06                    15

paragraph are referred to collectively as "Lehman Brothers" or the "Lehman Brothers defendants."

67. The Lehman Brothers defendants acted in a coordinated manner, and each of the Lehman Brothers defendants acted with knowledge of the actions of other Lehman Brothers defendants, in connection with the services and other activities, described below, relating to Enron, the special purpose entities, the partnerships and the transactions at issue, such that each of the Lehman Brothers defendants may be deemed to be responsible for the activities of all of the Lehman Brothers defendants.

68. Defendant **Daniel H. Bayly** ("Bayly") resides in Darien, Connecticut. Bayly was Global Head of Merrill Lynch's Investment Banking division from 1999 until 2001, when he became Chairman of Investment Banking.

69. Defendant **James A. Brown** ("Brown") was a Managing Director and the head of Merrill Lynch's Strategic Asset Lease and Finance group.

70. Defendant **Robert S. Furst** ("Furst") resides in Dallas, Texas. Furst was a Managing Director of Merrill Lynch and, during the relevant period in 1999 and 2000, was the Enron relationship manager for the investment bank.

71. Defendant **William Fuhs** ("Fuhs") was a Managing Director and vice president in Brown's group reporting to Brown.

72. Defendant **Schuyler Tilney** ("Tilney") is a resident of Houston, Texas. Tilney was the head of the Houston office of Merrill Lynch's Global Energy and Power division until 2001, when he was promoted to Global Head of the Energy and Power group.

73. Collectively, Merrill Lynch, James A. Brown, Robert S. Furst, William Fuhs and Schulyer Tilney will be referred to as "the Merrill Lynch Defendants."

## II.    Introduction

74.    As a result of the direct and/or indirect actions of Defendants in this case, Plaintiffs made investment decisions regarding Enron securities and suffered damage.  Had Plaintiffs known of the financial shenanigans masquerading inside Enron, Plaintiffs would have made different investment decisions concerning Enron securities.

75.    Collectively, the Defendants identified in paragraphs 2-13 are referred to as the "Andersen Defendants."  The Andersen Defendants had the responsibility of auditing Enron's financial statements to ensure they complied with Generally Accepted Auditing Principles ("GAAP").    Additionally, the Andersen Defendants' conduct in auditing Enron's financial statements was required to comply with Generally Accepted Auditing Standards ("GAAS").

76.    Collectively, the Defendants identified in paragraphs 14-49 are referred to as the "Enron Defendants."  The Enron Defendants, through their positions as directors and/or senior officers of Enron, had responsibility for the management of Enron's business and operations.

77.    Collectively, the Defendants identified in paragraphs 50-72 are referred to as the "Bank Defendants."  The Bank Defendants aided Enron and its senior management and directors in the creation of complex financial transactions that allowed Enron to manipulate its financial statements.

78.    It is appropriate to treat the Enron Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in Enron's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above.  Each of the above officers and directors of Enron, by virtue of his high-level position with Enron, directly participated in the management of Enron, was directly involved in the day-to-day operations of Enron at the highest

levels, and was privy to confidential proprietary information concerning Enron and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding Enron, and approved or ratified these statements. They each profited greatly from their inside knowledge of what the real condition of Enron was before that condition was made known to the general public or to the Plaintiffs herein.

79. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Securities Exchange Act, was traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the state securities laws of the state of Texas, the Enron Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to Enron's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of Enron's publicly-traded securities would be based upon truthful and accurate information. The Enron Defendants' misrepresentations and omissions violated these specific requirements and obligations and caused the Plaintiffs herein invested in Enron securities when they would not have had they known the facts known to and concealed by these Defendants. These representations by the Defendants either directly to Plaintiffs or through the public dissemination of misleading information to the Plaintiffs were relied on by the Plaintiffs to their detriment.

80.    The Enron Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature or recklessly disregarded the misstatements.  Because of their Board membership and/or executive and managerial positions with Enron, each of the Enron Defendants had access to the undisclosed adverse information about Enron's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that this adverse information rendered the positive representations issued or adopted by Enron and made by or about Enron and its business materially false and misleading.

81.    The Enron Defendants, because of their positions of control and authority as officers and/or directors of Enron, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to Enron.  Each Enron Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Enron Defendants is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations contained therein.  In fact, several Enron Defendants, including but not limited to Andrew Fastow, Ben Glisan, Richard Causey, Mark Koenig and Michael Kopper, have either entered guilty pleas or cooperation agreements in criminal cases pending against them judicially admitting to intentionally concealing the true financial status of Enron and manipulating Enron's financial statements knowing reasonable investors would rely on their false and misleading financial disclosures.

82.     In addition, the Audit and Compliance Committee ("Committee") of the Enron Board of Directors serves as the overseer of Enron's financial reporting, internal controls and compliance processes.  Every year during the relevant time period, the Committee met with the Andersen Defendants, as well as Enron officers and employees responsible for legal, financial and accounting matters.  These Enron officers and employees necessarily included Lay, Skilling, and Fastow.  In addition to recommending the appointment of independent auditors, like the Andersen Defendants, to the Board of Directors, the Committee reviewed the scope of and fees related to the audit, the accounting policies and reporting practices, contract and internal auditing and internal controls.  In relevant years, the Committee was comprised of Directors Jaedicke, Chan, Foy, Wakeham, Gramm, Mendelsohn, and Ferraz Pereira.  The reports approved or prepared by the Defendants herein were false, misleading and deceptive and were relied on by Plaintiffs herein. Additionally, Plaintiffs attach and incorporate herein as Exhibit A the expert report of Daryl Koehn which addresses specific facts regarding the conduct of various Enron Defendants.

83.     The Andersen Defendants were hired by Enron with the approval of its directors to provide the accounting data necessary for compliance with Texas state securities statutes and requirements of the NYSE.  The Andersen Defendants' relationship with Enron included being paid to provide both outside audits of Enron's financial statements as well as internal audits, a clear conflict of interest.  As a result the Andersen Defendants' owed a duty of full and complete disclosure to shareholders in Enron and its employees, as well as regulatory authorities, the stock exchange and state law.  The Andersen Defendants breached that duty by failing to fully and adequately disclose Enron's debt positions by overstating Enron's net income for each year

beginning in 1997 and by failing to fully and adequately disclose Enron's involvement with private investment limited partnerships formed by Enron executives.

84.    The Andersen Defendants were also hired by Enron with the approval of its directors to provide its opinion that Enron's system of internal controls was adequate.  This opinion was false and misleading in view of the many material errors and omissions in the financial statements.

85.    In the course of rendering services to Enron, the Andersen Defendants either obtained knowledge of or recklessly disregarded the true financial picture of Enron.  The Andersen Defendants pursued a conspiracy and common course of conduct with the Enron Defendants and aided and abetted in the making of the false and misleading statements complained of herein.  The Andersen Defendants were direct, necessary and substantial participants in the conspiracy and common course of conduct complained of herein.  The Andersen Defendants and the Enron Defendants were the agents of each other and were, at all times relevant herein, acting within the course and scope of said agency.  The Andersen Defendants have admitted to being both an internal auditor of Enron and its independent auditor and that it received compensation for non-audit services.  The Andersen Defendants have admitted to Congress that it knew of the course of conduct that resulted in the inaccurate financial condition of Enron and failed to disclose such conduct to anyone.  Andersen's Chief Executive Officer Joe Berardino testified before the U.S. House of Representatives Committee on Financial Services on December 12, 2001 that, with respect to 20% of the underreported special purpose entity consolidated losses, "our team made an error in judgment."  Against this background, Andersen had global net revenues of $9.3 billion for the fiscal year end for August 31, 2001, $47.5 million of which came from services related to Enron, $3.2 million of

which was related to services for review of financial controls. Despite this amount of billings to Enron and clear "error in judgment", the Andersen Defendants maintained their independence and continued to request the public's confidence.

86.　The Bank Defendants are full service financial institutions. During the relevant period, the Bank Defendants provided a variety of banking and other services to Enron, and were involved in the structuring and financing of special purpose entities, partnerships and transactions. The Bank Defendants' financing aided Enron in its efforts to manipulate its financial statements.

87.　The Bank Defendants were among Enron's main lenders, acting as lead bank on a transaction or a member of a syndicate of banks on a number of Enron credit facilities. The Bank Defendants' loans to Enron or Enron-related entities were in the hundreds of millions, and perhaps billions, of dollars and, upon information and belief, included loans to special purpose entities, loans for the purchase of assets, as well as credit lines to back up Enron's commercial paper. During the relevant period, the Bank Defendants were paid tens of millions of dollars in fees and other income for services provided to Enron, the special purpose entities and partnerships as a result of their participation in aiding other Defendants in the manipulation of Enron's finances. Because these manipulations were undisclosed to the Plaintiffs and the rest of the investing public, these manipulations of Enron finances made Enron appear to be a successful and financially sound corporation. As a result of the perceived strong financial success of Enron, Plaintiffs invested in Enron securities believing they were safe investment options.

88.　During the relevant period, the Bank Defendants also issued securities analyst reports that were widely disseminated to the public and enhanced the public's perception of

Enron's financial performance and condition, its prospects and its creditworthiness, and which therefore encouraged, and were intended to encourage, investment in, or business with, Enron or affiliated entities. The Bank Defendants issued analyst reports in which they rated Enron stock and securities a "buy" or a "long-term buy." During the relevant period, the Bank Defendants issued over 100 such reports. Through the public dissemination of this information, Enron appeared to be in excellent financial condition. Plaintiffs relied on the public perception that Enron was in excellent financial condition and invested in Enron securities.

89.     In addition, top executives of the Bank Defendants interacted with top executives of Enron on a regular basis during the relevant period, addressing Enron's business, financial condition and plans, financing needs and prospects, as well as the special purpose entities, partnerships and transactions.

90.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on Plaintiffs by disseminating materially false and misleading statements as well as internal and external audits and significant consulting services, a clear conflict of interest and/or concealing material adverse facts. The scheme deceived the Plaintiffs and the investing public regarding Enron's business, its finances and the intrinsic value of Enron; and caused Plaintiffs to invest in Enron securities resulting in damage to Plaintiffs.

### III.     Jurisdiction and Venue

91.     Plaintiffs assert that subject matter jurisdiction is proper in Texas state court because only state law claims are asserted and there is no basis for federal subject matter jurisdiction. However, the Court has held that "related to" federal bankruptcy jurisdiction exists.

92.     Venue is proper in Harris County, Texas because it is the county in which all or a substantial part of the acts or omissions occurred. Venue is also proper in Harris County, Texas

Oda12898 Amd Complaint Fi gsj 08-17-06                23

because it is the county of residence for multiple Defendants named herein.  Venue is also proper in the Southern District of Texas for federal purposes.

### IV.   Just the Facts

93.   In 1999, Defendant Fastow formed two investment partnerships, LJM Cayman L.P. ("LJM") and LJM2 Co-Investment L.P. ("LJM2").  LJM and LJM2 are private investment companies that, according to Enron's public filings, engage in acquiring and/or investing in primarily energy-related investments.  Fastow was the managing member of the general partner of each of the two partnerships.  He and his family profited handsomely from these entities set up to deceive investors such as these Plaintiffs.  Defendants Lay and Skilling approved Defendant Fastow's use of these fraudulent off-balance sheet entities to conceal Enron's true debt. Defendant Bauer assisted in approving these transactions on Enron's 1999 and 2000 financial statements and certifying they meet the applicable accounting rules to be considered off-balance sheet.

94.   While holding his position with LJM and LJM2, Fastow also maintained his role as chief financial officer, making him privy to internal asset analyses at Enron.  In fact, an offering memorandum for the LJM2 partnership said that his dual role "should result in a steady flow of opportunities . . . to make investments at attractive prices."

95.   Incredibly, the offering memo reportedly goes so far as to expressly acknowledge the glaring conflict of interest that existed under the agreement and the multi-million dollar incentive for Fastow to engage in self-dealing to the detriment, and at the expense of, Enron and its stockholders to whom he and the Enron Defendants owed a fiduciary duty and states that this dual role "should result in a steady flow of opportunities . . . to make investments at attractive prices and that *Mr. Fastow would find his interests 'aligned' with investors because the*

"*economics of the partnership would have significant impact on the general partner's [Fastow] wealth*" (emphasis added).

96.     Defendants clearly breached their duties by expressly approving the agreement with Fastow which created a situation of irreconcilable conflict and placed Enron's CFO in the middle of that conflict by putting Fastow, who was responsible for overseeing the financial interests of the company, in charge of partnerships that routinely purchased assets from Enron and in a position of self-dealing. Fastow arranged to enrich his family and others through these entities at the expense of the shareholders.

97.     Remarkably, Defendant Lay reportedly denied the existence of any conflict of interest arising out of the LJM arrangement. Such related-party transactions, involving top managers or directors, are not unusual, he said. "Almost all big companies have related-party transactions." Yet Lay either knew or should have known that certain insiders were being enriched at the expense of shareholders such as Plaintiffs herein.

98.     Enron publicly stated that the partnership deals were aimed to help it hedge against fluctuating values for its growing portfolio of assets. In its last ten years, Enron saw its asset base rocket to more than $100 billion, then drop dramatically as the actions of the Defendants herein became known. As a result of this rapid growth, Enron has at times been strapped for capital and has sought ways to bring in outside investors to help bolster its balance sheet. Those efforts, however, were orchestrated by the Enron Defendants in an effort to hide debt of Enron and overstate earnings. Had these earnings not been overstated, Plaintiffs would have made different investment decisions regarding Enron securities before suffering significant losses.

99.     Despite statements designed to make the partnership deals seem innocuous, the positions Fastow held with the partnerships (and Enron) allowed Fastow to benefit from the illicit use of confidential, non-public information.  An egregious example of this occurred in connection with a $30 million LJM2 investment in a project known as "Raptor III" in September 2000.  This transaction involved writing put options committing LJM2 to buy Enron stock at a set price for six months.  Writers of put options benefit from higher prices of the underlying stock, and are hurt by declining prices.  As reported in the *Wall Street Journal* on October 19, 2001:  "Only four months into this six month deal, LJM2 approached Enron to settle the investment early, causing LJM2 to receive its $30 million capital invested, plus $10.5 million in profit."  The information quoted came from an internal report produced by Defendant Fastow for the partnership investors, but withheld from the public.  The article further reported that:  "The renegotiation was before a decline in Enron's stock price, which could have forced LJM2 to buy Enron shares at a loss of as much as $8 each."  Thus, Fastow and LJM2 took advantage of inside information to recap illicit insider trading profits, in the millions of dollars in this transaction alone.

100.    The fallout from the revelations about the partnership wrongdoing had negative financial repercussions for Enron.  These included a steep decline in its stock price, loss of investor and Wall Street confidence, and ultimately bankruptcy.  The cover up of the Fastow agreement and other related transactions by the directors and auditors subjected Enron to strong criticism from investors and analysts alike and resulted in the stock price plummeting.

101.    On October 23, 2001, the Associated Press reported that various partnership transactions purportedly resulted in a gain of $16 million (pretax) in 1999, and a loss of $36 million in 2000.  The same article quoted a top analyst as sharply criticizing the directors

and officers' concealment of the partnership deals. "What you are hearing from many is that the company's credibility is being questioned and there is a need for disclosure," said David Fleischer of Goldman, Sachs & Co. "That is exactly what I think needs to happen. There is an appearance that you are hiding something . . . . I for one find the disclosure is not complete enough for me to understand." To add fuel to the fire, Enron also acknowledged that the SEC had begun an investigation into the Andersen Defendants' auditing practices with regard to the partnerships and whether the audits were done according to GAAP.

102. On the basis of the foregoing, the Enron Defendants in many respects breached the duties that each of them owed to its stockholders, such as Plaintiffs, by expressly approving of a number of agreements that placed Enron's Chief Financial Officer Fastow in a position where he was permitted to capitalize on his knowledge of Enron's proprietary financial information for the benefit of numerous partnerships of which he served as a general partner.

103. Significantly, officers and directors of Enron had financial interests in all or some of these partnerships. As such, by approving the agreements that enabled Fastow to act in dual capacities, Enron Defendants effectively engaged in self-dealing and placed Fastow in a position where he was capable of misappropriating Enron's confidential financial information for the purpose of enriching the partnerships he served as a general partner of, as well as furthering the financial interests of other investors in the partnerships — all to the detriment of the shareholders. In so doing, the Defendants breached the duties that each of them owed to Enron's stockholders and caused the value of their stock holdings to drop drastically, when this information became public.

104. According to published reports, the general partner (Fastow) of the two investment partnerships, LJM and LJM2, was paid management fees as much as 2% annually of

Oda12898 Amd Complaint Fi gsj 08-17-06                27

the total amounts invested in the partnerships.  Additionally, the general partner was eligible for profit participation that could produce tens of millions of dollars more if the partnership met its performance goals over its projected 10-year life.  Inasmuch as the partnerships were formed with the intention of managing over $200 million in assets, Defendant Fastow's potential profits from managing the partnership exceeded $4 million a year.

105.  LJM and LJM2 have engaged in billions of dollars of complex hedging transactions with Enron — in which Enron's interests were adverse to these entities.  Because Defendant Fastow was on both sides of the transactions between Enron and the investment partnerships, the terms of those transactions were not at arm's-length and there was no reasonable method to ensure that the terms of those transactions were equivalent to transactions that could have been engaged in with third parties.  The Andersen Defendants, specifically Defendant Bauer, failed to include these transactions on a consolidated balance sheet as required by GAAP.

106.  For example, Enron entered into a series of complex transactions in 1999 involving LJM and a third-party, pursuant to which (i) Enron and the third-party amended certain forward contracts to purchase shares of Enron common stock, resulting in Enron having forward contracts to purchase Enron common shares at the market price on the day of the agreement, (ii) LJM received about 6.8 million shares of Enron common stock, and (iii) Enron received a note receivable and certain financial instruments from LJM hedging an investment held by Enron.  These transactions should have appeared on the consolidated accounts of Enron in accordance with GAAP, but did not, misleading the Plaintiffs herein.  Defendants Lay and Skilling knew these transactions were a fraudulent attempt to conceal Enron's ever growing debt.

107. During the fourth quarter of 1999, LJM2 acquired approximately $360 million of merchant assets and investments from Enron. Further, in December 1999, LJM2 entered into agreements to acquire certain of Enron's interest and assets for about $45 million. This was not on a consolidated balance sheet prepared by the Andersen Defendants, including Defendant Bauer.

108. In 2000, Enron again entered into transactions with LJM, LJM2, and entities related to LJM and LJM2, to hedge certain merchant investments and other assets. Enron contributed about $1.2 billion of assets, including notes payable and restricted shares of outstanding Enron common stock and warrants, to LJM-related entities. Additionally, Enron entered into derivative transactions with a combined amount of about $2.1 billion with LJM-related entities to hedge certain assets. These transactions put Enron at risk in amounts exceeding $1 billion, yet were not included on Enron's consolidated balance sheet or properly reported to investors by Enron's independent auditor, Arthur Andersen. Had this information been disclosed, Plaintiffs could have become aware of the true financial picture at Enron and could have avoided at least part of their losses. Defendants Lay and Skilling knew these transactions were a sham to conceal debt but approved their reporting in Enron's financial statements.

109. In all, between June 1999 and September 2001, Enron and Enron-affiliated entities did 24 deals with LJM or LJM2 or both, ranging from buying and selling hard assets, purchasing debt or equity interests, and selling the rights to buy or sell shares of stock at certain preset prices. These were not included on financial reports prepared by the Andersen Defendants, approved by Defendants Lay, Skilling and the directors and relied upon by Plaintiffs. Defendants Lay and Skilling knew these transactions were not intended for any

economic purpose but to conceal Enron's debt and boost earnings forecasts so the price of Enron stock would increase.

110.   In fact, the LJM2 offering document, which was prepared under the direction of Defendant Fastow, admitted that the responsibilities of Mr. Fastow and other partnership officials to Enron could "from time to time conflict with fiduciary responsibilities owed to the Partnership and its partners."  This fact, however, was not disclosed to the public or Plaintiffs.

111.   As reported in TheStreet.com on July 12, 2001, Skilling was questioned in a conference call that day about Enron's transactions with LJM and LJM2.  Defendant Skilling falsely represented the true state of affairs by representing that LJM and LJM2 had done "a couple of real minor things."  The Defendants either knew or should have known that these representations were false, yet they did nothing to inform the Plaintiffs of the true facts and liabilities of these transactions.  This failure to disclose caused damage to each of the Plaintiffs herein.

112.   In July 2001, Fastow terminated his interests in the partnerships, and Enron unwound its financial relationships with the partnerships, yet Plaintiffs were kept in the dark concerning the effect of these transactions on the value of Plaintiffs' shares, until too late as the value of their shares had decreased dramatically.

### V.   Additional Materially False and Misleading Statements

113.   On January 18, 2000, Enron issued a press release approved by its officers and directors announcing its financial results for the fourth quarter of 1999 and fiscal year 1999.  The Company reported that for fiscal 1999 it earned $957 million and had revenues of $40 billion.  Defendant Lay commented on the results, stating in pertinent part as follows:

> Our strong results in both the fourth quarter and full year 1999 reflect excellent performance in all of our operating businesses. . . .  In addition, Enron continues

to develop innovative, high-growth new businesses that capitalized on our core skills, as demonstrated by the early success of our new broadband services businesses. Overall, a great year — one in which our shareholders received a total return of 58 percent.

114. However, Lay declined to mention that he had been consistently selling his shares while in possession of the material adverse information concerning Enron's operations and materially misled the investing public, thereby inflating the price of Enron's publicly traded stock. Plaintiffs have suffered substantial damages as they relied on these misleading statements disseminated to the public.

115. On January 20, 2000, Enron issued a press release announcing that the Company had hosted its annual analyst conference in Houston that same day. With respect to the broadband services division, the press release stated in pertinent part as follows:

The new name of Enron's communications business, Enron Broadband Services, reflects its role in the very fast growing market for premium broadband services. Enron is deploying an open flexible global broadband network controlled by software intelligence, which precludes the need to invest in a traditional point-to-point fiber network.

116. Defendant Skilling knew that this was false and misleading, yet failed to correct the statement, causing the Plaintiffs herein to rely on it. Defendant Skilling knew that the broadband network had never turned a profit and he knew that profits in this field were highly unlikely. Plaintiffs relied on the statements made from the press release of the conference and various statements in the media to their detriment.

117. On April 12, 2000, Enron issued a press release announcing its financial results for the first quarter of 2000, the period ending March 31, 2000. Enron reported net income of $338 million, or $0.40 per share, and revenues of $13.1 billion. Defendant Lay highlighted the company's broadband business, stating in pertinent part as follows: "In our newest business, we significantly advanced deployment of our broadband network and saw strong response to our

bandwidth intermediation and content delivery products." The press release further described the developments in the broadband business as follows:

> Enron is replicating its unique business model and skills to deploy a global network for the delivery of comprehensive bandwidth solutions and high bandwidth applications.
>
> During the first quarter, Enron significantly advanced its network development. New agreements have been signed with over 20 broadband distribution partners.

118.   Defendants Lay and Skilling either knew or should have known that this was false, misleading and deceptive as broadband had never earned any profit. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the company, its businesses, and operations, as alleged herein. The Plaintiffs relied on these false representations of material facts to their detriment.

119.   On July 24, 2000, Enron issued a press release announcing its financial results for the second quarter of 2000, the period ending June 30, 2000. The company reported net income of $289 million, or $0.34 per share, and revenues of $16.9 billion for the second quarter. Defendant Lay described the results as "another excellent quarter" and highlighted that Enron Broadband Services had recently executed "an exclusive, 20-year, first-of-its-kind contract with Blockbuster to stream "on-demand movies." The press release further reported that Enron Broadband Services had executed $19 million in new contracts. The directors, officers, and auditors, by virtue of their high-level positions, and their participation in and/or awareness of Enron's operations and/or intimate knowledge of the false financial statements filed by Enron and disseminated to the investing public including the Plaintiffs, had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Enron, including the content and dissemination of these various statements which they should have

known were false, misleading, and deceptive. Moreover, Defendants Lay and Skilling knew that Enron Broadband Services did not have the capability to perform the exclusive twenty-year contract. Furthermore, Defendants Lay and Skilling knew that Enron Broadband Services would be a failure financially because they knew there would never be enough demand for "on-demand movies" to make the deal economically feasible. Defendants Lay and Skilling further knew that it would be impossible for them to perform the twenty-year contract because Enron had never acquired the rights to distribute any movies. Defendant Lay's announcement led to the public perception that Enron was a doing well financially and its financial growth would continue in the future. The Plaintiffs relied on these false representations of material facts to their detriment.

120.    On October 17, 2000, Enron issued a press release announcing its financial results for the third quarter of 2000, the period ending September 30, 2000. The company reported net income of $292 million, or $0.34 per share, and revenues of $30 billion. Defendant Lay commented on the results stating in pertinent part as follows:

> Enron delivered very strong earnings growth again this quarter, further demonstrating the leading market positions in each of our major businesses . . . . We operate in some of the largest and fastest growing markets in the world and we are very optimistic about the continued strong outlook for our company.

With respect to Enron Broadband Services, the press release reported among other things, that "Enron delivered 1,399 DS-3 months equivalents of broadband capacity, which was a 42 percent increase over the previous quarter." The directors, officers and auditors including the Defendants herein, had a duty to be informed of all facets of the business and should have known that this was false, misleading, and deceptive. Defendants Lay and Skilling knew that these increases were the result of a Ponzi scheme created by off-balance sheet entities to make it appear Broadband was successful. Defendants Lay and Skilling knew this was false. Defendants Lay and Skilling knew that all "income" from Enron Broadband Services that quarter

was generated from fraudulent off-balance sheet transactions.  The public announcements caused Enron to appear financially sound and having future financial growth.  Plaintiffs relied on the false representations of material facts to their detriment, thus causing their injuries.

121.    On January 22, 2001, Enron issued a press release announcing its financial results for the fourth quarter of 2000 and fiscal year 2000, the period ending December 31, 2000.  The company reported earnings of $0.41 per share for the fourth quarter of 2000.  Defendant Lay commented on the results stating in pertinent part as follows:

> Our strong results reflect breakout performances in all of our operations, . . . .
> Our wholesale services, retail energy and broadband businesses further expanded their leading market positions, as reflected in record levels of physical deliveries, contract originations and profitability.  Our shareholders had another excellent year in 2000, as Enron's stock returned 89 percent, significantly in excess of any major investment index.

With respect to Enron Broadband Services, the press release stated:

> In addition, Enron Broadband Services reported a $32 million IBIT loss.  These results include costs associated with building this new business, partially offset by the monetization of a portion of Enron's broadband delivery platform.
>
> Enron Broadband Services delivered 2,393 DS-3 month equivalents of capacity, representing a 71 percent increase over the third quarter of 2000.  In addition, transaction levels also significantly increased to 236 transactions in the fourth quarter, compared to 59 transactions in the third quarter of 2000.

This statement was false and misleading and should not have been allowed by the directors, officers, and auditors, particularly the Defendants herein which knew the falsity of these representations.  These statements were perceived by the investing public that Enron was a financially sound company.  Plaintiffs relied on these public statements when assessing their investment strategies to their detriment.

122.    On January 30, 2001, Enron issued a press release announcing that it had priced an offering of 20-year zero coupon convertible senior debt securities, raising $1.25 billion.

Oda12898 Amd Complaint Fi gsj 08-17-06                    34

123.    On April 17, 2001, Enron issued a press release announcing its financial results for the first quarter of 2001, the period ending March 30, 2001.  The company reported earnings of $0.47 per share.  Defendant Skilling commented on the results, stating in pertinent part as follows:

> Enron's wholesale business continues to generate outstanding results. Transaction and volume growth are translating into increased profitability . . . .  In addition, our retail energy services and broadband intermediation activities are rapidly accelerating.

124.    With respect to Enron Broadband Services, the press release stated, among other things, as follows:

> Enron's global broadband platform is substantially complete, and 25 pooling points are operating in North America, Europe and Japan.  Enron's broadband intermediation activity increased significantly, with over 580 transactions executed during the quarter – more than in all of 2000.  Enron also added 70 new broadband customers this quarter for a total of 120 customers.

125.    The directors approved this press release, causing a false impression to Plaintiffs of the value of their Enron securities.  The press release by Defendant Skilling failed to mention the many off-the-books transactions that had been utilized to boost the price of Enron stock, or that broadband had never generated a profit.  Skilling occupied a position that made him privy to non-public information concerning Enron. Because of this access, Skilling knew that the adverse facts specified herein were being concealed and false and misleading statements were being made.   Skilling knew these transactions were fraudulent.    Plaintiffs relied on this misrepresentation to their detriment.

126.    On July 12, 2001, Enron issued a press release announcing its financial results for the second quarter of 2001, the period ending June 30, 2001.  The company reported diluted earnings of $0.45 per share.  Defendant Skilling downplayed any concerns investors might have about Enron Broadband Services, stating in pertinent part as follows:

In contrast to our extremely strong energy results, this was a difficult quarter in our broadband business. However, our asset-light approach will allow us to adjust quickly to weak broadband industry conditions. We are significantly reducing our broadband cost structure to match the reduced revenue opportunities currently available.

None of the directors or other officers who were aware of the falsity of this statement made any attempt to correct this misstatement of the facts. In fact, when the press release was issued, Defendant Skilling knew the broadband division had generated no profits and was not expected to generate any. Had this been disclosed, Plaintiffs could have reduced their ultimate losses, but relied on these false statements to their detriment.

127. On July 25, 2001, *Bloomberg Business News* reported that at a meeting with analysts, Defendant Skilling stated that Enron will meet or beat its profit projections. The article stated in pertinent part:

"We will hit those numbers, and we will beat those numbers," Skilling told a meeting of analysts and investors in New York . . . .

Analysts have also cited concern about unpaid power bills by Enron customers in California and India, and losses by Enron's broadband trading unit, which may hurt Enron's profits.

"All of these are bunk," Skilling said. "These are not issues for this stock."

Defendants Skilling and Lay were provided with or had unlimited access to the company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Had Skilling revealed the true nature of the company, Plaintiffs herein could have avoided much of their losses.

128. On August 14, 2001, Enron issued a press release announcing that Defendant Skilling had resigned his positions at the company. This announcement surprised investors and the price of Enron common stock dropped in response. According to a report carried by

*Bloomberg Business News,* on August 17, 2001, after the announcement of Defendant Skilling's resignation, Defendant Lay met with investors and analysts "to calm fears that the company may be hiding dire financial news . . . ." The article quoted an analyst from UBS Warburg as stating: "Ken met with us to reassure us that there is nothing wrong with the company . . . .  There is no other shoe to fall, and no charges to be taken." Plaintiffs relied upon Defendant Lay's statement to their detriment. Defendant Skilling knew the true facts about Enron and deserted the company without informing the Plaintiffs herein of his prior false representations.

129.   Then, on August 29, 2001, Defendant Lay provided an interview to *Bloomberg Business News* which was carried on the newswires. Defendant Lay portrayed the broadband services division in highly positive terms. The following question/answer is illustrative:

Johnson:   There has been a lot of concern by investors recently over the company's broadband trading unit, which trades space on fiber optic networks. Where does Enron stand with fiber optic trading now? Have you — do you still remain hopeful in that sector? Or what's the outlook now?

Lay:   Why, no, that continues to grow, quarter-to-quarter, at a very good rate, so we're continuing to develop liquidity in the marketplace. I mean, the biggest single problem has been the shortage of creditworthy counter parties to do longer term transactions. But certainly, quarter-to-quarter, we continue to increase the number of trades rather significantly.

Lay failed to disclose the true financial situation of the company's broadband services. This representation was false, misleading and deceptive, but was reasonably relied upon by the Plaintiffs herein to their detriment.

130.   In September 2001, Defendant Lay sent an e-mail to employees after he knew that the stock value had declined appreciably indicating that the stock was still a good value. This representation was false, misleading, and fraudulent and resulted in damages to the Plaintiffs herein as its content were disseminated to the public.

Oda12898 Amd Complaint Fi gsj 08-17-06                    37

131. The statements referenced above were each materially false and misleading when made because they misrepresented and/or omitted the following adverse facts which then existed and disclosure of which was necessary to make the statements made not false and/or misleading, including:

(a) that Enron Broadband Services was experiencing declining demand for bandwidth and the Company's efforts to create a trading market for bandwidth were not meeting with success as many of the market participants were not creditworthy. Indeed, broadband had never made a profit and was not expected to make a profit;

(b) that Enron's operating results were materially overstated as a result of Enron's failing to timely write-down the value of its investments with LJM and LJM2;

(c) that Enron was failing to write-down impaired assets on a timely basis in accordance with GAAP; and

(d) the failure to include off-the-books transactions in its required public filings.

132. As a result of the foregoing, Defendants' earnings projections and statements about the Company's prospects and outlook were lacking in a reasonable basis at all times. The Plaintiffs investment were based on these publicly false and misleading statements or omissions which created the impression Enron was a financially strong company. All of these representations or failures to disclose caused damage to the Plaintiffs herein.

133. As alleged herein, the individual Defendants including Lay, Skilling and Bauer either knew or should have known that the public documents and statements issued or disseminated in the name of the company were materially false and misleading, that such statements or documents would be issued or disseminated to the investing public, including the

Plaintiffs, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents which led to the detriment of the Plaintiffs. By virtue of their receipt and/or modification of Enron's materially misleading misstatements and/or their associations with Enron, these Defendants were privileged to the information concerning Enron and nonetheless participated or aided in this fraudulent scheme alleged herein.

## VI.  The Results of the Deception

134.  On October 16, 2001, Enron surprised the market by announcing that the company was taking non-recurring charges of $1.01 billion after-tax, or ($1.11) loss per diluted share, in the third quarter of 2001, the period ending September 30, 2001.  Defendant Lay commented on the substantial charge, stating:  "After a thorough review of our businesses, we have decided to take these charges to clear away issues that have clouded our performance and earnings potential of our core energy businesses."  The press release further detailed the charge as follows:  $287 million related to asset impairments recorded by Azurix Corp.; $180 million associated with the restructuring of the Company's Broadband Services division; $544 million related to losses with certain investments and early termination during the third quarter of certain structured finance arrangements with a previously disclosed entity.

135.  An article in *The Wall Street Journal* on October 17, 2001, further explained the nature of the "structured finance arrangements with a previously disclosed entity," which was mentioned in the company's earnings release.  According to the article, the structured finance arrangements involved limited partnerships that were managed by Enron's Chief Financial Officer, Defendant Fastow.  The article stated in pertinent part as follows:

> The two partnerships, LJM Cayman LP and the much larger LJM2 Co-Investment LP, have engaged in billions of dollars of complex hedging transactions with Enron involving company assets and millions of shares of Enron stock.  It isn't clear from Enron filings with the Securities and Exchange Commission what

Enron received in return for providing these assets and shares.  In a number of transactions, notes receivable were provided by partnership-related entities.

136.    According to *The Wall Street Journal*, in a news report on October 17, 2001, the cryptic reference in the press release was to the "pair of limited partnerships that until recently were run by Enron's chief financial officer."  According to *The Wall Street Journal*, Enron privately acknowledged (initially) that its transactions with those partnerships resulted in write-downs of $35 million.  This representation was made by Defendants Lay and Fastow and was relied upon by the Plaintiffs to their detriment.  The actual write-downs were much greater than $35 million.

137.    The next day, on October 18, 2001, *The Wall Street Journal* further reported on the nature of Defendant Fastow's financial arrangements with the Company.  The article reported that "Enron had shrunk its shareholder equity by $1.2 billion as the Company had decided to repurchase 55 million of its shares that it had issued as part of a series of complex transactions with an investment vehicle" connected to Defendant Fastow.  The article stated in pertinent part as follows:

> According to Rick Causey, Enron's chief accounting officer, these shares were contributed to a "structured finance vehicle" set up about two years ago in which Enron and LJM2 were the only investors.  In exchange for the stock, the entity provided Enron with a note.  The aim of the transaction was to provide hedges against fluctuating values in some of Enron's broadband telecommunications and other technology investments.

138.    Defendants did not acknowledge, however, until October 17, 2001, that the $1.2 billion write-down was attributable to Enron's transactions with Fastow's investment partnerships.  On October 18, 2001, *The Wall Street Journal* reported that in a conference call on October 17, 2001, Defendant Lay stated that 55 million shares had been repurchased by Enron, as the Company "unwound" its participation in the transactions with the limited partnerships.

Oda12898 Amd Complaint Fi gsj 08-17-06                    40

This representation of Lay was false and misleading and did not apprise the market of the extent of Enron's misstatements.

139. Defendants failed to disclose this huge reduction in assets and shareholders' equity attributable to Enron's transactions with the investment partnerships, either in the October 16, 2001 press release or at the October 17, 2001 conference call, in an apparent admission of guilt of their wrongful conduct.

140. The price of Enron common stock fell sharply on these disclosures. On October 17, 2001, the price declined approximately 5% to a closing price of $32.20 per share on volume of more than 5 million shares. On October 18, 2001, the price dropped approximately 10% to close at $29 per share with over 9 million shares trading. According to Reuters news service, "Enron Corp. stock fell sharply on [October 18] as investors digested news of a $1.2 billion reduction in the energy giant's shareholder equity that attracted little attention when it was first disclosed earlier this week."

141. Enron's October 16, 2001 announcement and the continual "un-weaving" of Enron's business dealings prompted further concerns for investors regarding Enron's financial status. On November 6, 2001, Fitch Inc. downgraded Enron's senior unsecured debt to BBB- from BBB+, just a notch above junk bond or high-yield status. The prior week, Standard & Poor's Corp. lowered its credit rating on Enron to BBB while Moody's Investors Service lowered its rating to Baa2.

142. On November 8, 2001, Enron announced it was restating its finances as far back as 1997 to account for losses related to a number of complex partnerships resulting in a $586 million reduction in net income, an additional $2.5 billion in debt and 77-cent reduction in earning per share. This news prompted John Olson, an analyst with Sanders Morris Harris, to

state: "At the end of the day these details give support to the fear that Enron was a financial house of cards." In trading, Enron's stock closed at $8.63 on November 9, 2001. The finances that were restated had been prepared by or approved by the Defendants herein.

143. On Friday evening, November 9, 2001, Enron's rival in the energy trading business, Dynegy announced it would acquire Enron. Dynegy agreed to purchase Enron stock for an estimated $8.9 billion and assume $12.8 billion in Enron debt. Shareholders would have received 0.2685 share of Dynegy stock per Enron stock, an estimated $10.41 per Enron share.

144. As alleged herein, Defendants acted recklessly in that Defendants knew that the public documents and statements issued or disseminated in the name of the company were materially false and misleading; the Defendants knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents which they knew were false and misleading. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Enron, their control over, and/or receipt and/or modification of Enron's materially misleading misstatements and/or their associations with the company which made them privy to confidential proprietary information concerning Enron and aided or participated in the fraudulent scheme alleged herein.

145. Defendants wholly failed to issue true and complete financial statements regarding Enron, and the Andersen Defendants, as Enron's independent auditor, miserably failed investors in performing its obligations. The Andersen Defendants provided accounting services to Enron for a number of years and has performed independent audits of Enron's financial statements for at least the period of 1997 through 2000. In so doing, the Andersen Defendants falsely certified that the year-end financial statements contained in their reports fairly presented

Enron's financial position, results of operations and changes of financial position. The Andersen Defendants falsely certified that these financial statements had been examined in accordance with GAAP and GAAS.

146. As part of the services rendered to Enron, the Andersen Defendants were present at Enron's corporate headquarters, financial offices and other operations throughout the period in question and had continual access to, and knowledge of, Enron's private and confidential corporate financial and business information, including internal monthly financial statements, board minutes and internal memoranda. Further, the Andersen Defendants received substantial compensation for these services, and in addition, Arthur Andersen-related companies received equivalent, if not greater, compensation for related services. The Andersen Defendants, thus, knew or recklessly disregarded Enron's actual financial condition and business problems, which were concealed from the investing public. Despite this fact, the Andersen Defendants issued unqualified, misleading and false reports regarding Enron's finances for the periods of 1997, 1998, 1999, and 2000. At all times material hereto the Andersen Defendants had a conflict of interest because of the work done by its consulting entity, Andersen Consulting.

147. Andrew S. Fastow, was Enron's chief financial officer from March 1998 to October 24, 2001. He was also senior vice president of Finance from January 1997 to March 1998. In these positions, Fastow oversaw many of Enron's financial activities and reported directly to Enron's chief executive officer, either Skilling or Lay. In these positions, Fastow was responsible for reviewing and verifying the accuracy and reliability of Enron's filings with the Securities & Exchange Commission, including year-end financial statements. At all times relevant, Defendant Fastow was directly and indirectly over Michael J. Kopper ("Kopper"), an employee of Enron working under Defendant Fastow. Fastow even required Kopper's signature

to his certificate of compliance with Enron's code of ethics. The confidentiality agreement that Enron had which applied to all of the Enron Defendants herein, required employees, including Lay, Skilling, and Fastow, to disclose business activities outside of Enron that could be considered a conflict of interest among other obligations in those agreements. Similarly, the code of ethics of Enron, which was relied upon by the Plaintiffs herein because it was represented in the financial statements to be a strict code of ethics protecting shareholders, prohibited employees, such as Lay, Skilling, Fastow, and Kopper, from engaging in, among other activities, investments that could be considered a conflict with the interests of Enron. In contravention of this code of ethics and with the complicity of Lay, Skilling and the directors, Fastow made illegal gains from his fraud in violation of the code of ethics, including kickbacks and undisclosed fees, in addition to his millions he received in salary and bonuses, and through sales of Enron stock, as he was defrauding the Plaintiffs herein and other investors.

148. Specifically, Fastow supervised Kopper, also a resident of Houston, who held various executive positions at Enron for approximately seven years, through July 2001. Kopper reported directly to Defendant Fastow. Between January 2000 and July 2001, Kopper was also a managing director of LJM II Capital Management. In July 2001, Kopper left Enron to manage LJM2. Kopper purchased a general partner interest in the entity and another entity from the Defendant Fastow for approximately $16.5 million. This transaction was to the detriment of the shareholders such as Plaintiffs herein. On August 21, 2002, Kopper pleaded guilty to conspiracy to commit wire fraud and money laundering and agreed to pay $4 million in criminal proceeds to the United States government. In Cause No. H-02-3127, before U.S. District Judge Sim Lake, and when Kopper entered into a final judgment on August 22, 2002, he was ordered to pay disgorgement fees of $8 million, as well as additional amounts that were forfeited in his criminal

case. These actions of Kopper were participated in by Fastow and aided by Defendants Skilling, Lay and the directors of Enron.

149. Since at least the early 1990s, the officers and directors of Enron, including Defendants Skilling, Fastow, and Lay, engaged in transactions with other entities that were designed to improve the balance sheet of Enron. Enron's treatment of the entities for financial statement purposes, was subject to accounting rules that governed whether the assets and liabilities of the entities should be consolidated onto Enron's balance sheet, or treated as an investment by Enron in a separate entity not under Enron's control. With respect to these entities, all of the Defendants herein approved these as "off-balance-sheet" entities because it enabled these Defendants to represent the shares of Enron to be more attractive to investors, such as Plaintiffs. These representations caused the stock to be sold at a higher price thereby causing Plaintiffs to believe Enron was a financially successful company resulting in their investment decisions concerning Enron securities.

150. The Defendants herein approved a myriad of transactions that were structured to achieve off-balance-sheet treatment. Many of the transactions were structured using special purpose entities ("SPEs"). Under applicable accounting rules, an SPE could receive off-balance treatment only if independent third party investors made a substantive capitol investment, generally at least three percent (3%) of the SPEs assets, and the third party investment was genuinely at risk, among other things. If the third party was not truly independent of Enron, or its investment was not truly at risk, these transactions using the SPEs were improper. The various Defendants in this case knew that these transactions were improper, that the third parties were not truly independent, and that the investment of the third parties were not truly at risk, yet they approved the SPE transactions. Each of these transactions were done so as to create the

impression that Enron was a great investment opportunity to the public and Plaintiffs herein. The Andersen Defendants knew or should have known that the treatment of these SPEs and off-balance-sheet entities was improper and not in accordance with GAAP or GAAS. However, the Andersen Defendants signed off on the accounting treatment of these SPEs and in some instances, aided and participated in their creation and structure.

151.    Some of these SPEs were not eligible for off-balance-sheet treatment because the SPE that was required to be controlled by independent third party investors was in fact controlled by Defendant Fastow or his subordinate, Kopper, and the outside entity requirement had not been met. The third party investment requirement was also not met as there was no third party investment at risk. These SPEs should have been consolidated onto Enron's balance sheet by the Andersen Defendants. The Defendants in this case used their simultaneous influence over Enron's business operations in the SPEs as a means to secretly and unlawfully generate millions of dollars for themselves and others and to deceive Plaintiffs and others similarly situated.

152.    As early as 1997, Defendant Fastow devised a scheme to enrich himself and others while enabling himself to maintain secret control over the so-called off-balance-sheet assets. Defendant Fastow arranged that these off-balance-sheet assets would be sold to a supposedly independent SPE. Within Enron, these transactions became to be known as "friends of Enron" deals because the purportedly independent investors in the SPE actually were friends or family members of the Defendants herein and served as nominees under the control of the Enron executives. The Defendants, including Fastow, Skilling, and Lay, arranged for "friends of Enron" to retain control over assets while shedding the burdens of ownership, including the required public disclosure that should have been made by the Andersen Defendants in Enron's financial statements. Defendant Fastow, as well as others, known and unknown, had control of

the SPEs to secretly siphon off proceeds of the SPE transactions for themselves in violation of their duties to shareholders, such as Plaintiffs herein.

153.    One "friends of Enron" transaction related to Enron's efforts to appear to divest itself of its interest in certain wind farms in California so that the farms could continue to receive beneficial regulatory treatment, while Enron secretly retained control over the wind farms. Under applicable federal and state regulations in California, the wind farms qualified for financial benefits conferred on alternative energy sources that met certain requirements. When these wind farms did not meet these requirements, as they were more than 50%-owned by an electric utility or an electric utility holding company, Enron was in the process of acquiring Portland General Electric so it would become an electric utility holding company and would not be qualified for the beneficial regulatory treatment mentioned herein.

154.    To meet this challenge, the Enron Defendants devised a scheme where Enron would sell a portion of its interest in the wind farms to a partnership comprised of "friends of Enron." This was known as Alpine Investors ("Alpine"), which would buy Enron's interest in the wind farms. The investors in Alpine were all "friends of Enron" including relatives of Defendant Fastow's wife.

155.    Although Alpine did not complete the proposed transaction with Enron, Defendant Fastow, along with his subordinate, Kopper, created SPEs known as "RADR ZWS, L.L.C." and "RADR ZWS MM, L.L.C." (collectively, "RADR") which purchased a portion of Enron's interest in the wind farms. RADR was furnished with a $16.4 million loan from an Enron subsidiary approved by Defendants Fastow, Skilling, and Lay. Fastow knew that his participation as an equity investor in RADR would require Enron to make public disclosure, so he enlisted Kopper and "friends of Enron" to serve as supposedly independent third party

investors. These investors included a friend of Fastow's wife, Kopper's "domestic partner," and others affiliated with or controlled by Defendant Fastow and his subordinate, Kopper.

156. RADR began making distributions to "investors" on July 1, 1997. Two of the "investors" repaid their loans from Kopper on or about August 25, 1997. The next day, Kopper wire-transferred $481,850 to Fastow, which included the original loan amount from Fastow, plus $62,850 in interest, an approximate 15% return in four months.

157. RADR proved to be far more lucrative than initially expected, generating a "windfall" to investors. Defendant Fastow became aware of the windfall and demanded a share in the form of kickbacks through Kopper of investors' RADR proceeds. To disguise the nature of the payments, Fastow instructed Kopper to establish a "gifting program" whereby Kopper and his "domestic partner" made annual "gifts" of $10,000 to individual Fastow family members.

158. The $10,000 amount was chosen because IRS rules exclude from taxable income and do not require reporting of gifts of $10,000 or less made to any one person in one year. Defendant Fastow instructed Kopper that he and his "domestic partner" should write checks not only to Fastow, but also to Defendant Fastow's wife and to their children. Defendant Fastow attempted to conceal his link to the deal and failed to disclose it to investors, such as the Plaintiffs herein.

159. Because RADR was under the control of Fastow and his subordinate, Kopper, and the supposed investments by the friends were secretly funded by Fastow, RADR failed to qualify for off-balance-sheet treatment and should have been consolidated by Enron on the books and statements prepared by the Andersen Defendants. By failing to consolidate RADR on the Enron books, the Defendants herein falsely represented Enron's status to the Plaintiffs herein who relied on such representations to their detriment.

160. By late 1997, Defendants Fastow, Skilling, and Lay began creating SPEs that were under the direct control of various Enron executives. The first such SPE was Chewco Investments, L.P. ("Chewco").

161. In 1993, Enron and the California Public Employees Retirement System ("CALPERS") entered into a joint venture investment partnership called Joint Energy Development Investments, L.P. ("JEDI"). Enron was the general partner of JEDI and contributed $250 million in Enron stock. Kopper was the limited partner and contributed $250 million in cash. The financial statements prepared by the Defendants herein did not consolidate JEDI onto the Enron balance sheet and did not include JEDI's debt in its financial statements.

162. In approximately mid-1997, Enron began to seek a buyer for CALPERS' interest in the JEDI partnership so that CALPERS would agree to invest additional funds in an even greater partnership to be called JEDI II. Defendant Fastow proposed the formation of Chewco to buy out CALPERS' JEDI interest. Fastow initially planned to become Chewco's outside equity investor and general partner, but substituted his subordinate, Kopper, when it became clear that Fastow's own participation would be required to be disclosed in Enron's financial statements. However, Defendant Fastow directly or indirectly, through Kopper and his "domestic partner," controlled Chewco. This fact was not disclosed in the financial statements prepared by the Andersen Defendants and approved by Defendants Fastow, Lay, Skilling and the directors of Enron.

163. Before the deadline imposed by CALPERS, Fastow, with the complicity of Lay and Skilling, arranged to fund the purchase of CALPERS' JEDI interest through "bridge" loans from Barclays Bank, P.L.C. ("Barclays") and Chase Manhattan Bank ("Chase"). Each bank

loaned $191.5 million to Chewco with repayment guaranteed by Enron. Chewco used those loan proceeds to buy the interest of CALPERS in JEDI.

164. The bridge transaction was referred to by the Defendants herein as a "dirty close." The Defendants herein knew that the Chewco transaction failed to comply with SPE non-consolidation rules because Chewco had no genuine outside equity investment and because Enron had guaranteed Barclays and Chase against any loss. Enron thus planned, for financial reporting purposes, to replace the bridge financing year-end with another structure that would qualify Chewco as an SPE with sufficient equity.

165. However, Chewco structure at the end of 1997 again failed to meet SPE non-consolidation requirements. Its purported outside "equity" investment consisted of approximately $11 million from Chewco's general and limited partners. However, Enron structured the transaction so that $11.36 million of the supposed outside equity was actually borrowed from Barclays. The Barclays' loans were secured by approximately $6.58 million in cash that was generated by JEDI's November 1997 sale of assets. These funds were held in accounts that were fully pledged to Barclays, meaning that Barclays was partly protected against risk of loss. The remaining "outside equity" consisted of approximately $125,000 provided by Fastow's subordinate, Kopper, and his "domestic partner". In effect, Defendant Fastow controlled the entity in question.

166. Fastow's undisclosed control of Chewco and of his subordinate, Kopper, who controlled his "domestic partner", permitted Fastow to demand a share of Chewco's profits and other Chewco related funds. From December 1997 to December 2000, Fastow directed Kopper to secretly share with him various payments received by him related to Chewco. Kopper received a total of approximately $1.5 million in "management fees" related to Chewco, which

he shared with Fastow at his direction, mainly through checks made payable to members of Fastow's family.  Fastow directed Kopper to pay at least $54,000 to Fastow's wife for "administrative work" she reportedly did for Chewco.  In December 1998, Fastow caused Enron to pay a $400,000 "nuisance fee" to Chewco as compensation for agreeing to amend JEDI's partnership agreement, even though the amendment benefited Chewco, not Enron.  At Defendant Fastow's direction, his subordinate, Kopper, transferred approximately $67,224 of the nuisance fee back to Fastow, again through checks written to Fastow or members of his family.  These were funds that did not belong to Kopper or Fastow.

167.    In March 2001, Enron bought Chewco's limited partnership interest in JEDI. Fastow approved the purchase price of $35 million of which Kopper and his "domestic partner" made approximately $3 million.  In September 2001, Fastow authorized a further $2.6 million "indemnity payment" to be made to Chewco which Kopper subsequently transferred to himself. The payment was not contractually required and should not have been made, as it constituted fraud on investors, such as Plaintiffs herein.  The payment was, however, approved by Fastow, Skilling, and Lay to the detriment of the Plaintiffs.

168.    Chewco did not meet SPE requirements, due to, among other things, the undisclosed control by Defendant Fastow and his subordinate, Kopper, its lack of independence, and its failure to meet the outside equity requirement.  The entities Chewco and JEDI should have been consolidated in Enron's financial statements beginning in the fourth quarter of 1997. The failure to consolidate Chewco and JEDI caused the financial statements from the fourth quarter of 1997 through the second quarter of 2001 to be false, misleading, and deceptive.  Such failure was caused by the acts of the Defendants herein, all of which were relied upon by Plaintiffs to their detriment.

169. In November 2001, Enron had announced that it would consolidate Chewco and JEDI retroactively to 1997. This resulted in a massive reduction in Enron's reported net income and a massive increase in its reported debt. This also amounted to an admission by the Defendants herein that the books and financial statements of Enron since the fourth quarter of 1997 had been false, misleading, and deceptive. These false and misleading financial statements gave the impression that Enron was performing economically better than it actually was. Plaintiffs herein made investment decisions in Enron securities on the belief that Enron was performing in an economically sound manner.

170. The effect of consolidating Chewco and JEDI with the Enron financial statements would be a reduction of net income in the amounts of $45 million in 1997, $107 million in 1998, $153 million in 1999, and $91 million in 2000. Accordingly, the debts would be increased on the Enron books by $71 million in 1997, $561 million in 1998, $685 million in 1999, and $628 million in 2000. These were significant amounts and resulted in the financial statements that had previously depicted Enron as having financial strength and future growth to be false and misleading. Plaintiffs herein had made investment decisions regarding Enron securities relying upon the illusion that Enron was financially sound and was continuing to have economic growth and success.

171. In June of 1999, Defendant Fastow proposed the formation of an SPE called LJM Cayman, L.P. ("LJM") named after the first initials of his wife and two sons. Enron, through Defendants Lay and Skilling, as well as the board of directors, granted Defendant Fastow a waiver of Enron's conflict of interest rules so he could run LJM as its general partner. Fastow falsely represented to Enron's board that he would not benefit or profit from any appreciation in the value of Enron stock transferred to LJM. LJM had two limited partners, an entity owned by

Credit Suisse First Boston ("CSFB") and an entity owned by National Westminster Bank ("NatWest"). Each invested $7.5 million.

172. In October 1999, Defendant Fastow proposed formation of another SPE, LJM2 Co-Investment, L.P. ("LJM2"). Again, Defendant Fastow served as general partner through an intermediary. At the time, Fastow was Enron's Chief Accounting Officer ("CAO") and others, including Skilling and Lay, represented to Enron's board that Enron's CAO would review any Enron-LJM2 transactions to ensure they were fair to Enron. Defendant Fastow represented to Enron's board that the LJM entities would provide Enron with a potential buyer of any assets they wanted to sell. Enron's directors approved these transactions, thereby aiding Defendant Fastow in the creation and perpetuation of this fraud.

173. Defendant Fastow had an undisclosed agreement which was referred to as "Global Galactical" agreement or "Global Galactic" agreement. Under the agreement, a transaction with the LJM entities that resulted in a loss to the LJM entities would be made up later in subsequent LJM deals. As a result the LJM entities would not lose money in their dealings with Enron. In the meantime, representations of Defendants herein were made public concerning the false financial condition of Enron and its earnings. Plaintiffs herein made investment decisions regarding Enron securities as a direct result of the glowing financial picture of Enron.

174. The LJM entities were used fraudulently from approximately July 1999 through October 2001 to defraud Enron shareholders such as Plaintiffs herein. The LJM transactions enabled Fastow and the other Defendants to (i) manipulate Enron's financial results by fraudulently moving poorly performed assets off-balance-sheet, (ii) manufacture earnings for Enron through sham transaction with the LJM entity when Enron was otherwise having trouble

meeting its goals for a quarter, and (iii) improperly inflate the value of Enron's investments by back-dating transaction documents to dates advantageous to Enron. Each of these manipulations referred to herein was approved by the Defendants herein to the detriment of the Plaintiffs.

175. The Defendants herein engaged in these transactions because: (i) Defendant Fastow could rid Enron of poorly performing assets and thereby improve Enron's reported financial results which would in turn enable Defendants Fastow, Lay, and Skilling to earn continued prestige, salary, bonuses and other benefits from Enron to the detriment of the shareholders including the Plaintiffs herein; (ii) the LJM entities would make money on the dealings with Enron since Enron illegally and secretly guaranteed that the LJM entities would not lose money and if they did, would be made whole in future transactions; and (iii) Fastow, Skilling, and Lay, as well as others at the LJM entities, personally reaped huge sums of money from these transactions both in the form of management fees and skimmed deal profits, as well as inflated prices for the shares they owned in Enron which were sold for profit.

176. In 1999, Defendants Fastow, Skilling, and Lay caused Enron to engage in a fraudulent "sale" of assets to permit Enron to record approximately $12 million of earnings in the fourth quarter of 1999. This "sale" related to three electricity generating power barges owned by Enron. In December 1999, an Enron subsidiary entered into an agreement with certain Nigerian government entities for a three-phase energy project related in part to certain of Enron's power barges. These barges were expected to produce future revenues from an agreement to supply electricity to the Nigerian government.

177. After several failed attempts to sell a portion of this project, in December 1999 Enron, through Defendants Skilling, Fastow, and Lay, contacted Merrill Lynch and asked it to purchase a $28 million interest in the project which was 75% financed by Enron so that Enron

could book a gain at year end.  Such a sale would allow Enron to record approximately $12 million in earnings in the fourth quarter of 1999, so that Enron could meet earnings goals and to record a $28 million in flow of funds.  These transactions were reported to Plaintiffs in the fourth quarter of 1999 financial statements prepared or approved by the Defendants herein which were relied upon by the Plaintiffs to their detriment.

178.    Defendants Fastow, Lay, and Skilling personally guaranteed to the "financial institution," Merrill Lynch, that it would not lose money and would be taken out of the deal within a few months.  The financial institution was to receive an up front fee of $250,000 plus 15% per annum for the period the financial institution held the investment.  Enron falsely recorded the transaction with Merrill Lynch as a sale and improperly recorded approximately $12 million of fictitious earnings in the fourth quarter of 1999, which were relied upon by the Plaintiffs herein to their detriment.

179.    In 2000, in accordance with the representations made by Fastow, Skilling, and Lay, Merrill Lynch was bought out of its interest in the barges.  Defendants Fastow, Lay, and Skilling directed Kopper to have LJM2 buy Merrill Lynch's interest on or about June 29, 2000, the day before it had been represented to Merrill Lynch that they would be taken out of the barge transaction.  LJM2 bought the interest of Merrill Lynch for $7,525,000.  The price reflected a $525,000 premium over the original investment of Merrill Lynch.  This transaction was done to the detriment of the shareholders and caused injury to each of the Plaintiffs herein.

180.    There were many other transactions done by the Defendants that were "off-balance sheet" transactions such as Raptor I/AVICI, South Hampton, and Cuiaba.  Transactions with these entities were done to enrich the Enron Defendants herein through sales of their stock and resulted in false balance sheets and financial statements prepared by the Andersen

Defendants which were prepared by or approved by the Defendants and relied upon by the Plaintiffs to their detriment.

181.　Defendants Lay, Skilling, and Fastow, in concert with J.P. Morgan Chase & Company and CitiGroup, acted to misrepresent $8 billion in undisclosed loans as "prepays" that, in fact, were advance payments from customers.  By causing the "prepays" to be reported as energy trading activity, these Defendants, along with the Andersen Defendants, were able to maintain the high credit ratings of Enron and high stock price at which the stock was sold to the Plaintiffs herein.  Transactions that were in fact loans were represented by the Defendants herein on the financial statements of Enron to be sales of natural gas and other commodities to a "special purpose entity" known as Mahonia created by J.P. Morgan Chase & Company and CitiGroup in the Channel Islands of Britain.  The Andersen Defendants represented to investors such as Plaintiffs that these transactions were in fact being accounted for properly in the financial statements of Enron.  In reliance on these false representations of the Andersen Defendants working on the Enron audits, the Plaintiffs herein sustained damages for which they seek recovery in this action.

## VII.　Additional Facts regarding the Bank Defendants' Conduct

182.　In addition to the facts stated above, the Bank Defendants were involved in a multitude of improper transactions with the other Defendants named herein.  These transactions are chronicled in Neal Batson's Report.  Plaintiffs adopt Neal Batson's report and incorporate the facts presented in the report into this pleading.  However, by way of example, Plaintiffs discuss

some of the transactions below.[1]  Unfortunately, neither the Plaintiffs nor the investing public were aware of these financial shenanigans.

## JP Morgan, Citigroup, CSFB, CIBC, Bank of America and Merrill Lynch

183.    J.P. Morgan, Citigroup, CSFB, CIBC, Bank of America and Merrill Lynch each invested in LJM2.  J.P. Morgan invested in LJM2 through limited partners Sixty Wall Street Fund, L.P., Chemical Investments, Inc., and J.P. Morgan Partnership Investment Corporation, which committed $3 million, $10 million and $12 million, respectively, for a total of $25 million.  Citigroup invested in LJM2 through Primerica Life Insurance, Travelers Indemnity Company, Travelers Insurance Company, and Travelers Life and Annuity Company, which invested a total of $15 million.  CSFB invested in LJM2 through limited partners Merchant Capital, Inc. and DU Fund Investment Partners, III, which committed $10 million and $5 million, respectively, for a total of $15 million.  In addition, CSFB committed $10 million to the $65 million credit facility for LJM2 led by J.P. Morgan.  CSFB also committed $30 million to a $120 million credit facility for LJM2 in November 2000.  CIBC invested in LJM2 through limited partner CIBC Capital Corporation, which committed $15 million.  Merrill Lynch invested in LJM2 through ML IBK Positions, Inc., which committed $5 million.  Additionally, nearly 100 Merrill Lynch executives committed over $16 million to LJM2 through limited partner MULJM2 Co-Investment, L.P.  Bank of America invested in LJM2 through the Papyrus I Funding Trust, which made a $45 million commitment — the single largest commitment of any limited partner.  Bank of America formed Papyrus I Funding Trust as an SPE to invest in LJM2.  In addition, Defendants RBS and RBC loaned money to LJM2.

---

1        Plaintiffs do not intend for this to be an all inclusive list of the transactions the Bank Defendants were involved with in aiding the other Defendants to manipulate Enron's financial picture.  Rather these only serve as examples of the transactions the Bank Defendants were willing participants.

184.    According to the Powers Report[2], the LJM2 investors were provided a private placement memorandum that "emphasized Fastow's position as Enron's CFO, and that LJM2's day-to-day activities would be managed by Fastow, Kopper, and [former Enron treasurer Ben] Glisan" and "specifically noted that Fastow's 'access to Enron's information pertaining to potential investments will contribute to superior returns.' (Powers Report at 72.)

185.    The LJM2 partnership agreement provided for the establishment of an advisory committee to assist Fastow in the management and oversight of LJM2, and the LJM2 limited partners had the right to remove Fastow as the general partner. Upon information and belief, with their oversight and removal powers, the LJM2 limited partners, including J.P. Morgan, Citigroup, CSFB, CIBC, Merrill Lynch, and Bank of America, had the power to control the actions of LJM2.

**J.P. Morgan**

186.    Between 1997 and 2000, J.P. Morgan entered into seven "prepay" transactions with Enron: (1) "Chase VI" which closed in December 1997 and involved $300 million; (2) "Chase VII" which closed in June 1998 and involved $250 million; (3) "Chase VIII" which closed in December 1998 and involved $250 million; (4) "Chase IX" which closed in June 1999 and involved $500 million; (5) "Chase X" which closed in June 2000 and involved $650 million; (6) "Chase XI" which closed in December 2000 and involved $330 million; and (7) "Chase XII" which closed in September 2001 and involved $350 million.  These prepay transactions were improperly recorded and were in fact "disguised loans" that should have been recorded as such on Enron's balance sheet.  J.P. Morgan knowingly structured the prepaid transactions with Enron

---

2        William C. Powers, Jr., Report of Investigation by the Special Investigative Committee of the Board of Directors of Enron Corp., February 1, 2002.  ("Power's Report").

in a way that aided and allowed Enron to engage in fraudulent accounting and to make its financial statements less transparent.

187.    In fact, J.P. Morgan considered the prepay transactions as "disguised loans" for its own internal purposes:   In an internal Chase e-mail, one of Chase's most senior executives, referring to certain structured transactions including prepays similar to the prepays with Enron, stated: "WE ARE MAKING DISGUISED LOANS, USUALLY BURIED IN COMMODITIES OR EQUITIES DERIVATIVES (AND I'M SURE IN OTHER AREAS). WITH A FEW [sic] EXCEPTIONS, THEY ARE UNDERSTOOD TO BE DISGUISED LOANS AND APPROVED AS SUCH."

188.    Enron booked its liabilities on the prepay transactions as price risk management liabilities and the cash it received as cash flow from operations rather than as cash flow from debt, and J.P. Morgan was aware of that treatment.  A November 25, 1998 e-mail from a Chase employee explains to a colleague, "Enron loves [prepays] as they are able to hide funded debt from their equity analysts because they (at the very least) book it as deferred [revenue] or (better yet) bury it in their trading liabilities."

189.    Furthermore, in a July 1998 "pitch" presentation for soliciting additional business, J.P. Morgan marketed the prepay transactions as an "[a]lternative source of finance" and "[b]alance sheet `friendly,'" and explained that the transactions have an "[a]lternative accounting impact by converting funded debt to 'deferred revenue' or long-term trade payable" and "can be executed with little market visibility."

**Citigroup**

190.    Citigroup and Enron executed ten prepay transactions between December 1998 and June 2001. In all of these transactions, Citigroup was aware that Enron's primary motive was

to receive cash financings, but characterize the proceeds from the transactions on its financial statements as cash from operating (instead of financing) activities. Through these ten prepay transactions, Citigroup made available to Enron a total of $3.8 billion over a two and one-half year period.

191.    In its simplest form, the structure of the Enron-Citigroup prepay transactions involved three separate swap agreements: between Enron and a third party; the third party and Citigroup; and Citigroup and Enron.  Overall, the substance of one of the transactions is that Citigroup funded a $249.5 million disbursement to Enron and six months later Enron was obligated to repay Citigroup $255.6 million — an approximate five percent return to Citigroup exclusive of its arrangement fee. The future floating payment from Enron to Delta, Delta to Citigroup, and Citigroup to Enron exactly mirrored each other (i.e., same amounts and payment schedule) — canceling each other out. The combined operative effect of the three agreements was to pass the commodity price risk back to Enron.

192.    The third party in many of these transactions, Delta, was a nominally capitalized SPE established by Citigroup, whose sole purpose in these transactions was to aid and facilitate Enron's accounting treatment. Delta had no material independent resources available to engage in commodity trades. The only transactions that Delta participated in were those transactions that Citigroup asked it to execute and for which funding was provided by Citigroup. For the relevant transactions, Citigroup and Enron prepared the necessary documentation for Delta's signature. Moreover, whenever Enron needed to communicate with Delta (e.g., when Enron needed Delta to provide certain written representations for its auditors), Enron contacted Citigroup.

193.    Citibank executives, like their counterparts at Chase, knew full well the import, for Enron, of a transaction structure that appeared as if it were a commodities trade involving an

independent offshore third party. Describing Enron's desire for the prepaid structure, one Citibank executive stated, "[t]he use of a prepaid swap was not motivated by tax considerations but instead was necessary in order to report the transaction as part of [an Enron subsidiary's] price risk management activities rather than debt for financial accounting purposes." Another, describing the effect the prepaids had on Enron's balance sheet, bragged "E gets money that gives them cashflow but does not show up on books as big D Debt." And a third executive noted, "net net E has money today and pays back a fized [sic] stream over time—net net economically like a loan."

194.    Internal communications show that it was common knowledge among Citigroup employees that the "prepays" were designed to achieve accounting, not business, objectives and that Enron was booking the "prepay" proceeds as trading activity rather than debt.  The evidence indicates that Citigroup not only understood Enron's accounting goal – increasing operating cash flow without reporting debt – but designed and implemented the financial structures to aid Enron achieve this objective. Moreover, they accepted and followed Enron's desire to keep the nature of these transactions confidential.

195.    Citigroup also participated in yet another transaction known as Project Bacchus. Project Bacchus was structured by Enron as a sale of an interest in certain of its pulp and paper businesses to a special purpose entity ("SPE") capitalized by Citigroup with a $194 million loan and $6 million in equity. Citigroup understood that the $6 million in equity represented the three percent minimum capital investment by an independent, third party (here, Citigroup) considered necessary under the then existing accounting literature to avoid consolidating this entity with Enron for accounting purposes.  Enron and Citigroup signed documents that supported Enron's accounting treatment. Simultaneously, however, Citigroup obtained oral representations from

Enron that Citigroup would not lose money in connection with its three percent equity investment. Citigroup understood that reducing this representation to a written contractual term would have negated Enron's accounting treatment. Consequently, in substance, Citigroup was not at risk for its equity investment, thus rendering Project Bacchus a $200 million financing from Citigroup, which should have been accounted as such. At the end of December 2000, Project Bacchus generated $200 million of cash from operating activities and $112 million in pre-tax income for Enron.

**CSFB**

196.　CSFB entered into a $150 million oil swap transaction with Enron North America in December 2000.　CSFB knew that Enron desired to avoid classification of the proceeds of these transactions as loans on its financial statements and also understood that, from CSFB's internal perspective, the transactions nevertheless represented loans to Enron.

197.　In a series of internal e-mails in late-2000, CSFB employees described the proposed prepay transaction as an "oil-linked loan," and stated that "the net effect for [Enron] is raising $150M at L[IBOR] + 75 bps [basis points] for 9 months off balance sheet. As the swap is booked in their oil swap book and not treated as debt."

198.　After a CSFB lawyer raised concerns about the prepay transaction, asserting it posed "reputational risk" to CSFB, it was nonetheless approved. Afterwards the CSFB lawyer raised concerns, CSFB required Enron to make representations that Enron was responsible for determining its accounting treatment" and that Enron senior management was aware of the transaction.　Not wanting these fraudulent acts in writing, Enron provided verbal assurances. CSFB ultimately entered into the transaction and funded the prepay.

199.    In connection with documenting the transaction, CSFB instructed its lawyers in a December 15, 2000 e-mail that: "[V]ery important for .. . [Enron] is that the docs are as standard as possible and DO NOT include any representations on accounting driven transactions."

**CSFB and RBS**

200.    CSFB and RBS became LJM1's limited partners through investment entities known as Campsie, Ltd. (RBS) and ERNB, Ltd. (CSFB) investments of $7.5 million each.

201.    RBS knew that Fastow was prohibited from profiting from the Enron shares transferred to LJM1, but nonetheless circumvented these restrictions and generated substantial profits for each of the partners, including Fastow.  Specifically, RBS entered into total return swaps with a third party knowing that the total return swaps were contrary to the purpose for which LJM1 was contemplated.

202.    By the end of 1999, CSFB and RBS had "monetized" their interests in the LJM1 Enron stock for tens of millions of dollars in proceeds.  CSFB and RBS also immediately contributed $90.2 million of those proceeds to LJM1, and agreed to treat the funds as additional capital contributions from the limited partners in which Fastow could participate rather than as proceeds from the Enron shares in which Fastow was not supposed to participate. According to an internal RBS document, the transaction resulted in a "windfall" for Fastow that "was NEVER the intention of the original deal."

203.    The LJM1's limited partners were given substantial rights to participate in LJM1's affairs, including approval rights over investments that exceeded $10 million. Upon information and belief, because the purchase price paid by LJM1 in the Cuiaba transaction was greater than $10 million, the limited partners (namely, CSFB and RBS) approved the transaction,

knowing that its purpose was to permit Enron to achieve its goal of recognizing income and that there was an oral buy-back agreement relating to the Cuiaba transaction.

**RBS**

204.   RBS also provided the equity investment in four FAS 140 transactions with Enron: Sutton Bridge, ETOL I, ETOL II, and ETOL III.  RBS was repeatedly reassured by Enron officials that it would be repaid for its investments in these transactions.

205.   In each of the transactions, RBS knew that the assurances from Enron's officials had to be oral to protect any public disclosure regarding the true accounting purposes of these transactions.  As such RBS did not disclose the oral assurances of repayment to any third party.

206.   The RBS FAS 140 transactions, together with an RBS-funded $110 million prepay transaction, allowed Enron to falsely record hundreds of millions of income and understate its true debt on its 1999 and 2000 balance sheets.  For example, Enron and RBS closed the Sutton Bridge transaction on June 8, 1999, and it resulted in Enron's booking a $29 million capital gain and $68 million in cash flow. The transaction also provided RBS with revenues in excess of $1.2 million.  Additionally, ETOL I, ETOL II, and ETOL III closed November 2000, March 2001, and June 2001, respectively, and each transaction consisted of a monetization of Enron's investment in Teesside Utilities and Services Business. Upon information and belief, Enron used ETOL I to book a fourth quarter 2000 gain of $91.6 million.

207.   Internal RBS documents evinced that RBS had entered into a verbal agreement with Enron whereby Enron assured RBS the return of its equity investments in the FAS 140 transactions:

(a)   The head of RBS' structured finance group, Iain Houston, told colleagues in an August 10, 2000 e-mail that:

I have no issue doing this type of deal in view of the verbal assurances we have been given consistently by senior Enron staff -- most recently by Andy Fastow to [senior RBS executives Lain Robertson, Johnny Cameron] and other [RBS] leading lights.

(b)    Tom Hardy, the head of RBS' project finance group told RBS' credit committee in September 2000 that "the verbal assurances from Enron have come from a very high level and are unequivocal."

(c)    The credit applications for both ETOL II and ETOL III contained numerous references to the "informal arrangement" and "high level assurances" regarding the repayment of the equity and the yield in the two transactions.

**CIBC**

208.    Enron engaged in a number of transactions with CIBC that were designed to comply with FAS 140.  The role of CIBC in those transactions was to provide the 3% equity investment needed to qualify the transaction under FAS 140.  CIBC also knew that its equity was never really at risk and only participated in these transactions after receiving verbal assurances from Enron officials that CIBC would be repaid.  With the help of CIBC, Enron was able to create over $1.7 billion of operating cash flow and hide over $1 billion in debt.

209.    CIBC and certain of its employees knew, or were reckless in not knowing, that the loans were structured as asset sales for accounting and financial reporting purposes. CIBC also knew, or was reckless in not knowing, that the transactions yielded another substantial benefit to Enron: they allowed Enron to hide from investors and rating agencies the true extent of its borrowings because sums borrowed in the transactions did not appear as "debt" on Enron's balance sheet.

210.    Between June 1998 and October 2001, CIBC effectively loaned Enron approximately $2.66 billion in the form of purported asset sales. Defendants were willing to

engage in the transactions because they generated substantial fees and as an accommodation to an important client. Enron used CIBC's disguised loans to increase earnings by more than $1 billion, to increase operating cash flow by almost $2 billion, and to avoid disclosure of more than $2.6 billion in debt on its financial statements.

211.    In total, from 1998 – 2000, CIBC participated in twelve FAS 140 transactions, including the Hawaii transaction.  For example, the CIBC credit application for [FAS 140 Transaction] Discovery read: "`As highlighted, this equity reflects 3% of the total transaction size. This equity component is necessary to get the desired accounting treatment. This facility represents true equity risk. Note, however, as has been the case in previous transaction [sic] of this nature, Enron executive management will represent that this money will absolutely be repaid."

212.    In connection with the June 1999 Leftover and Nimitz FAS 140 transactions, a senior CIBC official's credit committee meeting notes stated: "In order to comply with accounting opinion, 3% of that transaction had to be structured without the guarantee of Enron Corp. and is formally supported only by the project interest itself though we have also been provided with the minuted verbal assurances of Enron's senior staff that the company will ensure that this section is fully retired."

213.    One CIBC employee actually wrote to others regarding the transactions:

"Unfortunately there can be no <u>documented</u> means of guaranteeing the equity or any shortfall or the sale accounting treatment is affected. We have a general understanding with Enron that any equity loss is a very bad thing. They have been told that if we sustain any equity losses, we will no longer do these types of transactions with them. We have done many 'trust me' equity transactions with Enron over the last 3 years and have sustained no losses to date. If there has been a case where the value of the asset has been in question, Enron has repurchased the asset at par plus our accrued yield."

One FAS 140 transaction that CBIC participated in was Hawaii.  CIBC and Enron completed a total of 22 transactions through the Hawaii FAS 140.

214.   One of the more publicized of the Hawaii transactions was known as "Project Braveheart." Project Braveheart involved a 20-year agreement between Enron and Blockbuster to provide video on demand ("VOD") to customers' homes. "Project Braveheart" . . . was designed to allow [Enron Broadband Services] to "monetize" the Blockbuster agreement ..."

215.   In order to complete the Braveheart transaction, EBS created a joint venture with two investors: nCube, a small VOD technology company . . . and "Thunderbird," an investment vehicle owned by an Enron-controlled investment fund called "Whitewing." nCube and Thunderbird purportedly combined to contribute 3% of the equity of the joint venture.  The joint venture was purposely "deconsolidated" from Enron's books so that the results of its operations were not reflected on Enron's financial statements.  EBS assigned the Blockbuster contract to the joint venture.  EBS then sold a portion of its interest in the joint venture for approximately $115 million to an investment structure called "Hawaii 125-0," which previously had been created and funded by the Canadian Imperial Bank of Commerce ("CIBC"). Enron recognized approximately $111 million of the $115 million it received from CIBC as revenue in the fourth quarter of 2000 and the first quarter 2001.

216.   With regard to these transactions, CIBC provided the "equity" stake only because Enron's senior management first orally promised CIBC that the "equity" would be repaid at or before maturity at par plus an agreed-upon yield. CIBC sought and obtained such promises from Enron's senior management in connection with its three percent equity investment in Projects Leftover, Nimitz, Alchemy, Discovery and Hawaii 125-0.

**Bank of America**

217.    An example of Bank of America's assistance to Enron was the Bammel Gas Trust Transactions.  Bank of America assisted in the structuring of and participated in Bammel, which was designed to provide Enron with off-balance-sheet funds and to permit Enron officers to manipulate Enron's publicly disclosed financial information in a materially misleading way.

218.    The Bammel Gas Trust Transaction involved the monetization of certain natural gas owned by Enron's former wholly owned subsidiary, Houston Pipe Line Company (`HPLC').  The transaction was structured to provide Enron with off-balance-sheet funds from the 'sale' of natural gas to an SPE formed to purchase the natural gas, while permitting Enron to continue to use the gas.

219.    Enron accounted for the Bammel Gas Trust Transaction as a sale of inventory, generating $232 million in revenue and cash flow from operating activities in 1997 and 1998 and understating Enron's liabilities by $232 million by the end of 1998.

220.    In November 1997, Enron solicited proposals for the monetization of gas stored at the Bammel storage facility and selected Bank of America's proposal which utilized a commercial paper conduit, with Bank of America the sole referral agent, supported by a liquidity backstop facility arranged by Bank of America.

221.    Bank of America and Enron entered into a series of agreements involving swaps, guarantees, and fees in conjunction with the transfer of the storage gas pursuant to which Enron guaranteed a source of funds to pay the interest and principal on the Bammel SPE Loan and the yield and base amounts of the equity Certificates.  Through the various agreements Enron retained substantially all downside risk and upside reward relating to the value of the Storage Gas, as well as the repayment obligation for the Bammel SPE's financing.

222.   Bank of America recognized that, the legal and accounting formalities aside, a true sale by Enron of the gas would not occur until 2004, at which time Enron would surrender possession and control of the gas; only then would third-party sales occur, with Enron realizing losses or gains based on 2004 market prices. A later Bank of America memorandum put the matter succinctly: "Simply put, Enron will not directly pay the Bammel obligations, but is ensuring that the events that are necessary for repayment will occur in the manner intended."

223.   Bank of America's credit approval memorandum stated the following, which made clear that the Bammel Gas Trust Transaction "did not satisfy the two unmet criteria for revenue recognition":

> "The [SPE] holds no assets other than gas in storage which means that other than the pressurization and borrowing rights fees (which are designed to cover interest and administrative costs), it has no funds. However, because it has structured that transaction, [BofA] ... recognizes that while the . . . [Bammel SPE Loan] is not considered Enron exposure, in reality it *is Enron credit exposure* the bank is taking since all funds and assets that flow in and out of the Trust come from Enron. It is Enron entities which guarantee that gas is in the storage field upon title transfer, and it is an Enron entity which will market gas on behalf of the SPV and pass sales proceeds to the Trust in 2004."

224.   Yet another Bank of America memorandum that highlights how the various swap agreements caused Enron to "retain[] future price *risk* respecting the Storage Gas":

> [The] SPE executed a forward-starting natural gas swap with NationsBank [now, Bank of America] to receive a fixed price for the gas against the floating price it will receive from the market in 2004. Simultaneously, Enron Capital and Trading (ECT), a natural gas derivatives market-maker, executed an offsetting commodity swap with NationsBank with identical tenor and notional value, except that ECT will receive the floating price from NationsBank. The offsetting swap with ECT removed price risk for NationsBank, leaving only the credit risk of Enron Corp. and ECT. NationsBank earned an up front fee from Enron for holding the credit risk.

225.   There can be no doubt that Bank of America knew Enron intended to account for the transaction improperly as a sale and not as a loan.

226.    Finally, an internal Bank of America memorandum makes clear that Bank of America was the designer of the Bammel Gas Trust Transaction; that it was designed to meet Enron's accounting objectives; and that the transaction was "a very lucrative" one for Bank of America.

**Barclays**

227.    On December 30, 1997, at the same time that Barclays funded the entities that had been set up by Kopper to provide Chewco's equity, JEDI distributed $16.6 million to Chewco. This distribution was made pursuant to a two-page side letter agreement (the "side letter agreement") dated December 30, 1997, which amended the terms of a revolving credit agreement, also dated December 30, 1997.  Chewco used approximately $6.6 million of this distribution to fund reserve accounts established to secure the funds loaned to Kopper's entities by Barclays to be contributed to Chewco as equity. Without the side letter agreement, the funds that Chewco received from JEDI could not have been used in this manner. The purpose of the side letter agreement was to permit Chewco to fund the reserve accounts required by Barclays as a condition of funding Chewco's equity.

228.    In the Fall of 2000, Barclays also participated in a "synthetic lease transaction" with Enron called J.T. Holdings.  Although Barclays knew that the assets to be leased had to be owned by an SPE with at least a 3% equity risk, Barclays required Enron officials to guarantee its equity interest before it would participate in the transaction.  Thereafter, Barclays made a $1.3 million equity investment in December 2000 after Barclays Director Richard Williams advised others at Barclays that he had received the necessary assurance, by stating:

> "We have had a number of conversations with Enron about the transaction risks and have agreed to go forward on the basis of explicit verbal support from the company's Treasurer. Specifically, Ben Glisan will commit to us that under all

circumstances Enron will execute its purchase option at a price sufficient to repay *in* full the holders of the B Notes and Certificates."

Still another FAS 140 transaction Barclays entered into with the same assurances was the Nikita transaction.

### Merrill Lynch

229.   The Merrill Lynch Defendants aided their client, Enron, commit fraud by engaging in two fraudulent transactions in December 1999. In the first transaction ("The Nigerian Barge Transaction"), Enron purportedly "sold" an interest in Nigerian energy barges to Merrill Lynch. However, this was not a true sale because the risk of ownership never passed to Merrill Lynch. Instead, the transaction was in effect a short term loan in which Merrill Lynch earned a specified rate of return. Moreover, pursuant to an undisclosed side deal between Enron and Merrill Lynch, Enron took Merrill Lynch out of the transaction in June 2000. As a result of this sham transaction, Enron reported (as Merrill Lynch knew it would) $12 million in income. In the second fraudulent transaction ("The Energy Trade"), Enron and Merrill Lynch entered into two energy option contracts that were designed to substantially cancel each other out. Enron agreed to pay Merrill Lynch a $17 million dollar fee for participating in what was essentially a risk-free transaction. Enron reported (as Merrill Lynch knew it would) $50 million in income from this sham energy trade.

### RBC

230.   In the summer of 2000, Enron asked RBC to structure a financing of Enron's purchase of a number of Power Purchase Arrangements ("PPAs") from the province of Alberta, Canada for C$294.5 million.  RBC's internal documents reflect that its goal was "to permit Enron Canada to treat the financing as a commercial sales contract and not as debt on its balance

sheet." After Enron rejected a structure that involved an SPE not independent from RBC, RBC proposed:

> a strawman, an RBC lawyer who would contribute some equity to the transaction and become a purported part owner of [the SPE]. The lawyer would borrow the money from RBC on a full-recourse basis, but with an option to place the ownership interest with RBC. . . . In addition, RBC knew only 97% of the commodity risk of the transaction could be hedged. To protect the Bank completely, RBC bankers suggested: "We deal with this issue by hedging the remaining 3% at the top of the structure and Enron isn't 'interested' in knowing about that transaction."

231. The final transaction, which closed on September 29, 2000, involved RBC funding 50% of the financing and Toronto Dominion funding the other 50% in two prepay transactions in which four swaps provided for two circular streams of payment among RBC and JP Morgan Chase, all guaranteed by Enron.

232. The transaction was "fraudulent," because RBC paid $147 million (Canadian) to Enron Canada up front and Enron North America was obligated to pay quarterly interest and principal on that amount. The floating cash flow circled from Enron Canada to RBC to Chase to Enron North America. In effect, the Alberta prepay transaction was merely a disguised loan from RBC to Enron, that permitted Enron to understate its debt and overstate its cash flow from operating activities by reporting its obligations as price risk management instead of debt.

### VIII.  Causes of Action

### COUNT I – Common Law Fraud and Fraud-on-the Market

233. Plaintiffs incorporate by reference each of the foregoing facts.

234. The Defendants, individually and in concert, engaged in a plan, scheme, and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud upon Plaintiffs and made various untrue and deceptive statements of material fact and omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs as set forth above. The purpose and effect of this scheme was to induce Plaintiffs to invest in Enron securities artificially inflated prices or take other action contrary to their financial well being.

235. Defendants, pursuant to their plan, scheme and unlawful course of conduct, knowingly and/or recklessly issued, or caused to be issued statements to the investing public as described above.

236. Defendants knew and/or recklessly disregarded the falsity of the foregoing statements. As senior officers and/or directors of the Company, internal and outside auditors and participants in the structuring and financing of special purpose entities, partnerships and transactions, the Defendants had access to the non-public information detailed above.

237. Defendants knew the Plaintiffs and investing public were ignorant of the undisclosed facts and knew of their inability to discover the truth. During the relevant time period, Plaintiffs believed Enron was a financially strong and growing company based on the information publicly disseminated by the Defendants and the alleged reputation of Enron in the community. In ignorance of the false and misleading nature of the representations described above, Plaintiffs relied, to their detriment on the integrity of the regulatory process and/or the market both as to price and as to whether these securities were marketable in the first instance and therefore, invested in Enron securities.

238. Had Plaintiffs known of the true operating and financial results of Enron, which, due to the actions or inactions of Defendants were not disclosed, Plaintiffs would have made different investment decisions regarding Enron securities.

239.     Plaintiffs were injured because the risks that materialized were risks of which they were unaware as a result of Defendants' misrepresentations, omissions and other fraudulent conduct alleged herein.  The decline in the price of Enron's stock was caused by the public dissemination of the true facts, which were previously concealed or hidden.  Absent said Defendants' wrongful conduct, Plaintiffs would not have been injured.

240.     The price of Enron common stock declined materially upon public disclosure of the true facts which had been misrepresented or concealed, as alleged in this petition.  Plaintiffs have suffered substantial damages as a result of the wrongs alleged herein, yet many defendants knowing the true value of the shares disposed of them before the directors and auditors made the true facts known about the stock value.

241.     Plaintiffs further allege that because Defendants knew that the representations described above were false at the time they were made, the representations were fraudulent and malicious and constitute conduct for which the law allows the imposition of exemplary damages. In the connection, Plaintiffs will show they incurred significant expenses, including attorneys' fees, in the investigation and prosecution of this action.  Accordingly, Plaintiffs request that exemplary damages be awarded against the Defendants in a sum within the jurisdictional limits of this Court.

### COUNT II – Negligence of Andersen Defendants

242.     Plaintiffs incorporate by reference each of the foregoing facts.

243.     The accounting firm of Arthur Andersen, L.L.P. ("Andersen") was hired by Enron with the approval of its directors to provide the audit data necessary for compliance with state statutes and requirements of the N.Y.S.E.  As a result the Andersen Defendants owed a duty of full and complete disclosure to shareholders in Enron, as well as regulatory authorities.  The

Oda12898 Amd Complaint Fi gsj 08-17-06                74

Andersen Defendants breached that duty by failing to fully and adequately disclose Enron's debt positions by overstating Enron's net income for each year beginning in 1997 and by failing to fully and adequately disclose Enron's involvement with private investment limited partnerships formed by Enron executives.  All of these actions or inactions violated general principles of accounting.

244.    For instance, based on information and belief, Defendant Fastow formed LJM and LJM2, private investment limited partnerships which affected the equity of shareholders such as Plaintiffs through its transactions with Enron.  These transactions were not adequately reflected in the filings done or overseen by the Andersen Defendants and were not reported by the Andersen Defendants in accordance with standard accounting practices.

245.    The financial activities of Chewco Investments, L.P. ("Chewco"), an investor in Joint Energy Development Investments Limited Partnership ("JEDI") should have been consolidated with Enron beginning in 1997.  The failure to consolidate Chewco caused a false financial picture to be given to shareholders such as Plaintiffs.

246.    The financial activities of JEDI should have been consolidated into Enron's financial statements prepared by the Andersen Defendants beginning in 1997 causing a false financial picture to be given about Enron to its investors such as Plaintiffs.  Such failure amounted to a violation of standard accounting practices by the Andersen Defendants and resulted in damages to Plaintiffs.

247.    The financial activities of LJM which engaged in derivative transactions with Enron to permit Enron to hedge market risks also should have been consolidated into Enron's financial statements beginning in 1999.  The failure to do so amounted to negligence on the part

Oda12898 Amd Complaint Fi gsj 08-17-06                    75

of the Andersen Defendants and resulted in losses to Plaintiffs. Such failure by the Andersen Defendants was also a violation of standard accounting practices.

248. Four SPEs known as Raptor I-IV (collectively "Raptor") were created in 2000 permitting Enron to hedge market risk in certain of its investments. Under generally accepted accounting principles, the note receivable from Raptor should have been included as a reduction to shareholders equity. The net effect of this accounting entry done by the Andersen Defendants was to overstate both notes receivable and shareholders' equity by approximately $172 million.

249. In connection with the work it performed for Enron, the Andersen Defendants also:

(a) Obtained, or recklessly disregarded, certain evidentiary matters which provided it with information revealing adverse facts about Enron's business and finances, and improperly failed to require, or to make, disclosure of such facts. As a result of its investigations and audit work, the Andersen Defendants knew, or recklessly disregarded, that Enron's publicly-disseminated reports and financial statements were materially false and misleading and/or failed to disclose material facts or thereby aided and/or abetted in the public dissemination of materially false and misleading financial statements.

(b) Knew or recklessly disregarded facts which indicated that it should have qualified its opinion on Enron's financial statements for Fiscal Years 1997 through the second quarter of 2001, the failure to make such a qualification was a violation of GAAS, including the Fourth Standard of Reporting, the first, second, and third standards of fieldwork.

(c) Failed to cause Enron and/or aided and/or abetted in the failure to disclose material facts and allowed Enron to make material misrepresentations regarding Enron to Enron's security holders and the investing public generally during the period in question, and

also took steps in furtherance of the conspiracy which aided and abetted the wrongdoing complained of herein.

      (d)      Knew or recklessly disregarded that Enron's publicly-reported revenues and earnings throughout the period in question were materially overstated because Enron employed improper asset and loss recognition techniques.

      (e)      Knew or recklessly disregarded that employees and officers of Enron had interests in and control over Special Purpose Entities ("SPEs") which would have caused such SPEs to be reported in consolidated financial reports of Enron.

      (f)      Knew or recklessly disregarded that employees and officers of Enron had close ties to the SPEs, which themselves had huge liabilities that the Andersen Defendants knew did not show up on consolidated financial reports of Enron.

      (g)      Knew or recklessly disregarded that Enron had a note receivable received in exchange for stock issued in 2000.

250.      The Andersen Defendants did not qualify its opinion on Enron's financial statements and system of internal control for fiscal years 1997 through 2001 and the failure to make such a qualification was a violation of GAAS, including the fourth standard of reporting and attestation standards established by the AICPA.

251.      These failures on the part of the Andersen Defendants each constituted negligence and were a proximate cause of the precipitous drop in the value of Plaintiffs' shares in Enron. All of the above transactions and the failure of the Andersen Defendants to properly record and document them constituted a violation of standard accounting practices.

### COUNT III- TEX. BUS. & COM. CODE. § 27.01:
### Statutory Fraud

252.      Plaintiffs incorporate by reference each of the foregoing facts.

253. In addition, or in the alternative, Defendants are also liable under TEX. REV. CIV. STATS. §27.01 (Vernon Supp. 2001).

254. The Defendants, individually and in concert, engaged in a plan, scheme, and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business and/or aided and/or abetted in the violation of §27.01 which operated as a fraud upon Plaintiffs and made various false and deceptive statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs as set forth above. The purpose and effect of this scheme was to induce Plaintiffs to make investment decisions regarding Enron securities.

255. Defendants, pursuant to their plan, scheme and unlawful course of conduct, knowingly and/or recklessly issued, or caused to be issued and/or aided in and/or abetted in the issuance of statements to the investing public as described above.

256. Defendants knew and/or recklessly disregarded the falsity of the foregoing statements. As senior officers and/or directors of the Company, internal and outside auditors and participants in the structuring and financing of special purpose entities, partnerships and transactions, the Defendants had access to the non-public information detailed above.

257. In ignorance of the false and misleading nature of the representations described above, Plaintiffs relied, to their detriment on the integrity of the regulatory process and/or the market both as to price and as to whether these securities were marketable in the first instance and invested in Enron securities.

258. Had Plaintiffs known of the true operating and financial results of Enron, which, due to the actions or inactions of Defendants were not disclosed, Plaintiffs would have made different decisions regarding their investment of Enron securities.

259. Plaintiffs were injured because the risks that materialized were risks of which they were unaware as a result of Defendants' misrepresentations, omissions and other fraudulent conduct alleged herein. The price of Enron common stock declined materially upon public dissemination of the true facts which had been previously misrepresented or concealed, as alleged in this petition. Plaintiffs have suffered substantial damages as a result of the wrongdoings alleged in this petition. Absent said Defendants' wrongful conduct, Plaintiffs would not have been injured.

260. As a result of the fraudulent acts alleged herein, Defendants benefited significantly and were personally enriched by either receiving enormous fees, gaining insider trading profits, increasing business, as well as investment opportunities or other unseemly personal gains. Defendants' failure to disclose the falsity of the information disseminated to the investing public and their indifference to the harm the nondisclosure would cause Plaintiffs constitutes the type of fraud which requires the imposition of exemplary damages.

261. Plaintiffs further allege that Defendants had actual awareness of the false and misleading nature of the statements described herein, of which can be inferred by Defendants' participation and/or aiding and/or abetting in the drafting, preparation, and/or approval of the various misstatements. Their actual awareness of the misrepresentations is fraudulent and malicious and also constitutes conduct for which the law allows the imposition of exemplary damages. In the connection, Plaintiffs will show they incurred significant expenses, including attorneys' fees, in the investigation and prosecution of this action. Accordingly, Plaintiffs

request that exemplary damages be awarded against the Defendants in a sum within the jurisdictional limits of this court.

## COUNT IV – TEX. REV. CIV. STATS. art. 581-1 *et seq.*

262.　　Plaintiffs incorporate by reference each of the foregoing facts.

263.　　In addition or in the alternative, Defendants are also liable under TEX. REV. CIV. STATS. art. 581-1 *et seq.* (Vernon Supp. 1997).

264.　　The Enron Defendants, because of their positions of control and authority as officers and/or directors of the issuer corporation, Enron, were able to and did control and had the capability of influencing the direction of the corporation and content of the various SEC filings, press releases and other public statements pertaining to Enron which were false and misleading.  Each Enron Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Enron Defendants is responsible for the accuracy of the public reports and releases detailed herein, and are therefore liable for the injuries that Plaintiffs suffered.

265.　　The Andersen Defendants, in their capacity as auditors hired by Enron, directly and/or indirectly materially aided Enron in defrauding Plaintiffs.  In connection with the work it performed for Enron, the Andersen Defendants:

(a)　　Obtained, or recklessly disregarded, certain evidentiary matters which provided it with information revealing adverse facts about Enron's business and finances, and improperly failed to require, or to make, disclosure of such facts.  As a result of its investigations and audit work, the Andersen Defendants knew, or recklessly disregarded, that Enron's publicly-disseminated reports and financial statements were materially false and misleading and/or failed

to disclose material facts or thereby aided and/or abetted in the public dissemination of materially false and misleading financial statements.

(b)    Knew or recklessly disregarded facts which indicated that it should have qualified its opinion on Enron's financial statements for Fiscal Years 1997 through the second quarter of 2001, the failure to make such a qualification was a violation of GAAS, including the Fourth Standard of Reporting, the first, second, and third standards of fieldwork.

(c)    Failed to cause Enron and/or aided and/or abetted in the failure to disclose material facts and allowed Enron to make material misrepresentations regarding Enron to Enron's security holders and the investing public generally during the period in question.

(d)    Knew or recklessly disregarded that Enron's publicly-reported revenues and earnings throughout the period in question were materially overstated because Enron employed improper asset and loss recognition techniques.

(e)    Knew or recklessly disregarded that employees and officers of Enron had interests in and control over Special Purpose Entities ("SPEs") which would have caused such SPEs to be reported in consolidated financial reports of Enron.

(f)    Knew or recklessly disregarded that employees and officers of Enron had close ties to the SPEs, which themselves had huge liabilities that the Andersen Defendants knew did not show up on consolidated financial reports of Enron.

(g)    Knew or recklessly disregarded that Enron had a note receivable received in exchange for stock issued in 2000.

266.    The Bank Defendants provided a variety of banking and other services to Enron, and were involved in the structuring and financing of special purpose entities, partnerships and transactions that aided Enron in creating the illusion that it was financially sound.

267.    These acts and others aided and abetted Enron and the Defendants and were committed with intent to deceive, intent to defraud and/or with reckless disregard for the truth. Plaintiffs were substantially injured as a result. As a result Defendants are jointly and severally liable for the harm caused to the Plaintiffs.

## COUNT V – Civil Conspiracy

268.    Plaintiffs incorporate by reference each of the foregoing facts.

269.    The Defendants conspired together to commit fraud. In particular, the Defendants made certain representations to Plaintiffs regarding the financial condition of Enron that they knew were not true. The Defendants filed annual and quarterly reports with the SEC which they knew had false and misleading information concerning the finances of Enron and which were done illegally or through illegal means. Defendants reviewed, certified and/or audited the financial statements of Enron indicating Enron was reaping profits greater than the actual profits that would have been shown had the reports been done in a legally required manner following generally accepted accounting practices. These reports were either prepared by the Andersen Defendants or prepared under their direction. The Bank Defendants agreed to and did provide a variety of banking and other services to Enron, and were involved in the structuring and financing of special purpose entities, partnerships and transactions enabling Enron to create the illusion that it was financially sound.

270.    Plaintiffs relied on the information disseminated to the public about Enron and its reputation in the community and made investment decisions regarding Enron securities, unaware that the finances of Enron were being inflated. Each has suffered damages as a result. Defendants continued to make representations which were false, and which they knew were false and not in the best interest of the Plaintiffs in order to deceive the Plaintiffs and maximize their

own profits. The Defendants directly benefited by way of reaping large profits by selling of their own Enron stock at artificially inflated prices and/or collecting millions of dollars in auditing and banking fees that would not have been realized absent the misrepresentations.

## COUNT VI – Aiding & Abetting

271.    Plaintiffs incorporate by reference each of the foregoing facts.

272.    In addition to the preceding allegations, Defendants are also liable under common law theories of aiding and abetting.

273.    The Bank Defendants provided a variety of banking and other services to Enron, and were involved in the structuring and financing of special purpose entities, partnerships and transactions enabling Enron to create the illusion that it was financially sound. The actions of the Bank Defendants provided substantial assistance to the other Defendants in falsely stating the real value of Enron and its true financial picture.

274.    During this period, the Bank Defendants knew that the economic purpose of their transactions was for no other reason than to remove debt and create fake income for Enron's balance sheet in order to defraud Plaintiffs and the marketplace. The Bank Defendants assisted and encouraged the other Defendants to participate and continue the use of these fraudulent transactions while they reaped large fees and profitable windfalls for themselves. The Bank Defendants' assistance and/or encouragement was a substantial factor in the downfall of Enron. Had the Bank Defendants not agreed to participate in these clandestine and covert transactions, the remaining Defendants would not have been successful creating the illusion that Enron was a highly successful corporation.

275.    The Enron Defendants, because of their positions of control and authority as officers and/or directors of the issuer corporation, Enron, were able to and did control and had

Oda12898 Amd Complaint Fi gsj 08-17-06              83

the capability of influencing the direction of the corporation and content of the various SEC filings, press releases and other public statements pertaining to Enron which were false and misleading. Each Enron Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Enron Defendants is responsible for the accuracy of the public reports and releases detailed herein, and are therefore liable for the injuries that Plaintiffs suffered.

276. The Andersen Defendants, in their capacity as auditors hired by Enron, directly and/or indirectly materially aided Enron in defrauding Plaintiffs. In connection with the work it performed for Enron, the Andersen Defendants:

(a) Obtained, or recklessly disregarded, certain evidentiary matters which provided it with information revealing adverse facts about Enron's business and finances, and improperly failed to require, or to make, disclosure of such facts. As a result of its investigations and audit work, the Andersen Defendants knew, or recklessly disregarded, that Enron's publicly-disseminated reports and financial statements were materially false and misleading and/or failed to disclose material facts or thereby aided and/or abetted in the public dissemination of materially false and misleading financial statements.

(b) Knew or recklessly disregarded facts which indicated that it should have qualified its opinion on Enron's financial statements for Fiscal Years 1997 through the second quarter of 2001, the failure to make such a qualification was a violation of GAAS, including the Fourth Standard of Reporting, the first, second, and third standards of fieldwork.

(c)     Failed to cause Enron and/or aided and/or abetted in the failure to disclose material facts and allowed Enron to make material misrepresentations regarding Enron to Enron's security holders and the investing public generally during the period in question.

(d)     Knew or recklessly disregarded that Enron's publicly-reported revenues and earnings throughout the period in question were materially overstated because Enron employed improper asset and loss recognition techniques.

(e)     Knew or recklessly disregarded that employees and officers of Enron had interests in and control over Special Purpose Entities ("SPEs") which would have caused such SPEs to be reported in consolidated financial reports of Enron.

(f)     Knew or recklessly disregarded that employees and officers of Enron had close ties to the SPEs, which themselves had huge liabilities that the Andersen Defendants knew did not show up on consolidated financial reports of Enron.

(g)     Knew or recklessly disregarded that Enron had a note receivable received in exchange for stock issued in 2000.

### COUNT VII – Negligent Misrepresentation

277.     The Enron Defendants, because of their positions of control and authority as officers and/or directors of the issuer corporation, Enron, were able to and did control and had the capability of influencing the direction of the corporation and content of the various SEC filings, press releases and other public statements pertaining to Enron which were false and misleading.  Each Enron Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Enron Defendants

is responsible for the accuracy of the public reports and releases detailed herein, and are therefore liable for the injuries that Plaintiffs suffered.

278.    The Andersen Defendants, in their capacity as auditors hired by Enron, directly and/or indirectly materially aided Enron in defrauding Plaintiffs.  In connection with the work it performed for Enron, the Andersen Defendants:

(a)    Obtained, or recklessly disregarded, certain evidentiary matters which provided it with information revealing adverse facts about Enron's business and finances, and improperly failed to require, or to make, disclosure of such facts.  As a result of its investigations and audit work, the Andersen Defendants knew, or recklessly disregarded, that Enron's publicly-disseminated reports and financial statements were materially false and misleading and/or failed to disclose material facts or thereby aided and/or abetted in the public dissemination of materially false and misleading financial statements.

(b)    Knew or recklessly disregarded facts which indicated that it should have qualified its opinion on Enron's financial statements for Fiscal Years 1997 through the second quarter of 2001, the failure to make such a qualification was a violation of GAAS, including the Fourth Standard of Reporting, the first, second, and third standards of fieldwork.

(c)    Failed to cause Enron and/or aided and/or abetted in the failure to disclose material facts and allowed Enron to make material misrepresentations regarding Enron to Enron's security holders and the investing public generally during the period in question.

(d)    Knew or recklessly disregarded that Enron's publicly-reported revenues and earnings throughout the period in question were materially overstated because Enron employed improper asset and loss recognition techniques.

Oda12898 Amd Complaint Fi gsj 08-17-06                    86

(e)     Knew or recklessly disregarded that employees and officers of Enron had interests in and control over Special Purpose Entities ("SPEs") which would have caused such SPEs to be reported in consolidated financial reports of Enron.

(f)     Knew or recklessly disregarded that employees and officers of Enron had close ties to the SPEs, which themselves had huge liabilities that the Andersen Defendants knew did not show up on consolidated financial reports of Enron.

(g)     Knew or recklessly disregarded that Enron had a note receivable received in exchange for stock issued in 2000.

## IX.     Spoliation of Evidence

279.    Plaintiffs would show that the Andersen Defendants undertook a concerted effort to destroy documents concerning its audit of Enron beginning in September 2001 when it began to appear that the prior Enron audits, reports and filings done by the Andersen Defendants would be determined to be false, misleading and illegal.  These documents were destroyed at the behest of in-house counsel for the Andersen Defendants according to information and belief and reports of the news media.  The Court should rule that based on the deliberate destruction of evidence by these Defendants that the jury should be instructed that those documents must be presumed to be harmful to the position of the Andersen Defendants.  Documents have also been destroyed by employees of Enron acting under the direction of their CEO, Defendant Lay.

## X.     Joint and Several Liability

280.    The Defendants acted in concert and should be held jointly and severally liable for the damages suffered by Plaintiffs herein.

## XI.   Damages

281.   As a result of Defendants' wrongful conduct, actions and omissions, Plaintiffs have suffered substantial actual and special damages, far in excess of the minimal jurisdictional limits of this Court, to Plaintiffs' detriment.

282.   Plaintiffs have suffered actual damages and losses to their detriment, including the greater of the difference between the amount or consideration paid for the Enron securities and:

(a)   the true fair market value of such securities at the time of purchase (*i.e.,* had there been no misrepresentation); or

(b)   the net amount received upon their sale.

283.   In addition, or in the alternative, Plaintiffs have suffered actual damages and losses, to their detriment, in the following respects:

(a)   Loss or diminution of principal invested or the value of their stock in Enron Corp.;

(b)   Loss of investment opportunity;

(c)   Loss of earnings (including lawful interest); and

(d)   Commissions or fees incurred by way of investment in Enron securities.

284.   Plaintiffs have also suffered mental anguish damages.

285.   In addition to their actual damages, the common law of Texas allows recovery of punitive damages. Each of the Defendants' conduct was done fraudulently, knowingly, with actual awareness, malice and intent, and/or with such an entire want of care as to indicate that the acts and omissions in question were the result of conscious indifference to the rights, welfare or safety of the persons affected by them, including Plaintiffs, such that an award of exemplary or

punitive damages to be determined by the jury commensurate with the facts of this case is warranted.

## XII.    Jury Demand

286.    Plaintiffs request and demand a jury trial.

WHEREFORE, Plaintiffs pray for judgment as follows:

(a)    Awarding Plaintiffs compensatory damages, together with appropriate pre- and post-judgment interest at the maximum rate allowable by law;

(b)    Awarding Plaintiffs exemplary damages;

(c)    That the Defendants be held jointly and severally liable to the Plaintiffs for their losses sustained herein;

(d)    Awarding Plaintiffs their costs and expenses for this litigation including reasonable attorneys' fees and other disbursements;

(e)    As stated earlier, Defendants acted with intent and malice.  Plaintiffs are entitled to an award of exemplary damages.  Further, because Plaintiffs seek exemplary damages based on conduct of Defendants, described as a state jail felony in § 32.47(a), (b) and (d)(2) of the Texas Penal Code (fraudulent destruction, removal, or concealment of a writing), and listed in § 41.008(c)(12) of the Texas Civil Practice & Remedies Code, the statutory limitations on exemplary damages do not apply.  Specifically, § 32.47 provides that "A person commits an offense if, with intent to defraud or harm another, he destroys, removes, conceals, alters, substitutes, or otherwise impairs the verity, legibility, or availability of a writing, … (d) An offense under this section is a state jail felony if the writing:  (2) is a … writing for which the law provides public recording or filing, whether

or not the writing has been acknowledged." Writing as used in § 32.47 includes "printing

or any other method of recording information."; and

(f)    Granting such other and further relief as this Court deems to be just and

proper.

Respectfully submitted,

**FLEMING & ASSOCIATES, L.L.P.**
G. Sean Jez
State Bar No. 00796829
George M. Fleming
State Bar No. 07123000
1330 Post Oak Boulevard, Suite 3030
Houston, Texas  77056-3104
Telephone (713) 621-7944
Fax (713) 621-9638

By: _____
G. Sean Jez

**ATTORNEYS FOR PLAINTIFFS**

**OF COUNSEL:**

**MIKE O'BRIEN, P.C.**
Mike O'Brien
State Bar No. 15170200
1330 Post Oak Blvd., Suite 2960
Houston, Texas 77056
Telephone:  (713) 222-0088
Fax No.:  (713) 222-0888